## WOOD *v.* VANDALIA RAILROAD COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES
FOR THE DISTRICT OF INDIANA.

No. 11.   Argued December 17, 1912.—Decided October 20, 1913.

An order of a state railroad commission prescribing maximum freight rates on specified intrastate traffic will not be declared unconstitutional as confiscatory and depriving a railroad company of its property without due process of law where there is no proof of the value of the company's property within the State or of its receipts from its entire intrastate traffic, or of the value of that portion of the property affected by the order.

It does not necessarily follow from the mere fact that the total operating expenses of a railroad or of a division thereof bear a given relation to the entire receipts of that road or division, that the same ratio of expenses to receipts are maintained in regard to each particular class of traffic, and this court will not declare an order of a state railroad commission unconstitutional as confiscatory without proof as to the actual facts in regard to the particular rates complained of.

THE facts, which involve the constitutionality under the due process clause of the Fourteenth Amendment of an order of the Railroad Commission of Indiana prescribing maximum railroad freight rates for certain intrastate traffic, are stated in the opinion.

*Mr. Charles W. Smith* and *Mr. James E. McCullough,*
with whom *Mr. Henry H. Hornbrook, Mr. Albert P. Smith,
Mr. Thomas M. Honan,* Attorney General of the State of
Indiana, *Mr. Bernard Korbly* and *Mr. Willard New* were
on the brief, for appellants.

*Mr. John G. Williams,* with whom *Mr. Frederic D. Mc-
Kenney, Mr. D. P. Williams* and *Mr. S. O. Pickens* were
on the brief, for appellees.

MR. JUSTICE HUGHES delivered the opinion of the court.

The bill in this suit was filed by the Vandalia Railroad
Company, appellee, to restrain the enforcement of an order
made by the Railroad Commission of Indiana, on Decem-
ber 14, 1906, prescribing maximum freight rates for cer-
tain intrastate traffic. The ground of attack was that the
rates so fixed would not yield sufficient revenue to pay
the actual cost of the transportation covered by the order
and, hence, that the order violated the Fourteenth Amend-
ment of the Constitution of the United States. The case
was referred to a Special Master who made a report, sus-
taining the contention of the railroad company, which
was confirmed by the Circuit Court. Decree was entered
accordingly setting aside the order and permanently en-
joining proceedings to enforce it. Members of the Com-
mission, and the shippers on whose petition this action was
taken (who were made the defendants below), prosecute
this appeal.

The assignments of error are addressed to the single
point that the evidence failed to warrant the conclusion
that the prescribed rates were so unreasonably low that,
if they were maintained, the Company would be deprived
of its property without due process of law.

The Vandalia Railroad Company is a consolidated
corporation, organized on January 1, 1905, under the

laws of Indiana and Illinois, pursuant to an agreement made by five railroad companies. Of these the Terre Haute and Indianapolis Company owned a railroad extending from Indianapolis westward to the boundary between the States of Indiana and Illinois, and the St. Louis, Vandalia and Terre Haute Company owned a railroad extending from that point to East St. Louis, Illinois. These two lines, forming a continuous route between Indianapolis and East St. Louis, constituted what was called the St. Louis division of the new company. The other lines entering into the consolidation were the Terre Haute and Logansport, from Terre Haute to Logansport and South Bend, Indiana; the Logansport and Toledo, from Logansport to Butler, Indiana; and the Indianapolis and Vincennes, from Indianapolis to Vincennes, Indiana.

The order applied to that portion of the Vandalia Company's road which lay between Indianapolis and the western boundary of Indiana, a distance of about eighty miles, which originally belonged to the Terre Haute and Indianapolis Company. The order was further limited to the freight traffic moving on "class rates," that is, to the traffic, having its origin and destination on this part of the Company's line, which was embraced in the six classes of the "official classification" as theretofore established by the Company. The existing class rates were found by the Commission to be unreasonably high and the maximum rates in question were ordered to be substituted as just and reasonable.

There was no proof of the value of the complainant's property within the State of Indiana or of the return it received from its entire intrastate business. Nor was there proof of the value of that portion of its road which was affected by the order, or of the return from all of its intrastate business upon that part of its lines. No attempt was made to supply proof of that sort. For all that appears,

the Vandalia Company might enjoy, notwithstanding the enforcement of the rates in question, ample revenue from its intrastate operations to give it a fair return both as to all its lines within the State and also as to that portion to which the order referred.

The total tonnage of all kinds of freight on the eighty miles of railroad from Indianapolis to the Illinois boundary cannot be ascertained from the evidence. The amount of traffic moving on commodity rates is not shown. It was found by the Master, and it is undisputed, that the gross revenue from the transportation of that portion of the traffic which constituted the classified intrastate freight, on the described eighty miles of road, during the three years prior to the making of the order, was as follows: 1904, $79,803.80; 1905, $91,067.56; 1906, $102,241.15; and that the gross revenue from the same traffic, under the rates prescribed by the Commission, would have been in 1904, $52,222.12; in 1905, $60,079.13; in 1906, $66,936.99. This would have been a large reduction in the gross revenue from that particular traffic, but it must not be overlooked that the Commission found that the former rates were excessive; and the effect of this reduction upon the Company's net return was to be satisfactorily proved and could not be assumed.

The conclusion in the court below was reached in the following manner. The complainant showed, and the Master found, that for the year 1904 the operating expenses upon the line between Indianapolis and the Illinois boundary were 74.50 per cent. of the whole earnings upon that line from every source, and that after consolidation, in the years 1905 and 1906, the operating expenses of the entire St. Louis division were respectively 73.03 and 72.64 per cent. of the entire earnings of that division. These ratios were then applied for the purpose of determining the expense of transporting that part of the freight which moved under class rates between stations on the road from

Indianapolis to the Illinois boundary. Thus, it was assumed that, as the gross revenue from this classified freight was $79,803.80 in 1904, the expense of transporting it was 74.50 per cent. of that amount or $59,453.83; that, in 1905, with a gross revenue of $91,067.56, the expense was 73.03 per cent. thereof or $66,506.64; and that in 1906, with a gross revenue of $102,241.15, the expense was 72.64 per cent. or $74,267.97. According to this method of calculation, the revenue which would have been received under the order of the Commission would have been less than the expense of transportation.

It is plain, however, that it does not follow from the mere fact that the total operating expenses of a railroad, or of a division of a railroad, bear a given relation to the entire receipts of that road or division, that the cost of transportation in the case of a particular class of traffic bears the same relation to the revenue derived from that class. The ratio, in the first case, is found by bringing together a great variety of operations involving various rates and different outlays for different sorts of traffic. It is predicated of the whole volume of business considered as such, and may be far from true of some part of it considered separately. It does not purport to be an expression of the relative cost of any specified part but simply of that of the entire traffic to which it applies.

How hazardous may be the use of such a ratio to determine the relative cost of a fragment of the business is apparent in this case. Thus it appeared that the total gross earnings of the complainant's St. Louis division in the year 1905 was $4,750,811.13. Of this, the entire gross receipts from the classified freight here in question were only $91,067.56, or less than two per cent. The expenses of the division for that year were $3,469,544.81, or 73.03 per cent. of the total earnings as stated. In 1906, the earnings of the St. Louis division were $5,480,094.77, and the expenses were $3,980,906.90, or 72.64 per cent. These

amounts embrace interstate and intrastate traffic, freight and passenger, and all freight whether moving on class or commodity rates. A large increase or reduction in the class rates on the particular intrastate freight in question, the volume of business being the same (as is the assumption), would have had a very slight effect upon the ratio of cost to earnings based on the entire operations. To illustrate: Had the rates on the small portion of freight here under consideration been fifty per cent. higher than they actually were in 1905 and 1906, and had the gross revenue on this traffic been increased accordingly, the total receipts of the division would have been so little enlarged that the ratio of expenses to earnings for the entire division would still have been about 72.33 per cent. and 71.97 per cent. in those years respectively. If, on the same amount of traffic, the gross revenue from this classified freight in 1905 had thus been $136,601.34 instead of $91,067.56, and the above ratio were applied to determine the cost of its transportation, that cost would be made to appear to be $98,803.74. On such a calculation, it would follow, of course, that a reduction of thirty per cent. even in such rates, would bring the revenue on the same amount of business below its cost. Again, it is to be observed that had the rates prescribed by the Commission been in force in 1905 and 1906, and had other conditions been the same, the expense ratios for the whole volume of business of the St. Louis division would have been only 73.51 and 73.11 per cent. respectively.

In these circumstances, the ratio of total expense to total earnings affords, in itself, no sufficient basis for determining the cost of the transportation of the particular traffic covered by the order under review. It alone furnishes no ground for invalidating the finding of the Commission that the existing rates were exorbitant and that the substituted rates would be fair. Before such a ratio could properly be used in setting forth the cost of a speci-

fied portion of the traffic, it would be necessary to have evidence either justifying the conclusion that the cost in proportion to the revenue was substantially the same for that part of the traffic as for the whole, or, if there were a material difference, satisfactorily showing its nature and extent.

In defending the use of the method adopted below, appellee relies upon the case of *Smyth* v. *Ames*, 169 U. S. 466. There, the legislature of Nebraska had established a classification for all intrastate freight carried by railroad and had fixed the maximum rates to be charged therefor. With other evidence, the court had before it the testimony and exhibits furnished by one of the defendants in that case, a Secretary of the State Board of Transportation and a principal witness for that Board, who gave the results of his investigations with respect to the traffic of each company within the State. The ratio of expense to earnings on all business done within the State was thus shown, but reliance was not placed upon that alone. This witness also testified that upon the local business the percentage of expense to earnings would be at least ten per cent. more. We need not follow the elaborate analysis of the exhibits in *Smyth* v. *Ames, supra,* by which the appellants undertake to elucidate the differences between the traffic conditions there disclosed and those here involved. It is sufficient to say that the case cited cannot be regarded as affording basis for a contention that a ratio of expense to earnings on the entire business of a railroad, or of a division, can be taken to show the cost of some particular item or class of traffic in the absence of evidence with respect to that traffic which would warrant the conclusion that its cost in proportion to the revenue therefrom could properly be so expressed.

Each case, as was pointed out in *Smyth* v. *Ames*, must depend upon its special facts; and the record in the present case is barren of the necessary proof. Attention is

called to the expense ratio for the former Terre Haute and Indianapolis Company in the year 1904, that is, prior to the consolidation. But this was based on the total business of the road and no details are furnished showing that this ratio could rightly be applied to that part of it which made up the classified freight in question. There are certain statements with respect to the heavier cost of the operation of local as compared with through trains, but these statements are clearly inadequate. Local traffic may cost more per unit of freight movement than through traffic, but whether it costs more in proportion to revenue is another matter. That, of course, depends upon the rates charged and is a fact to be proved. (*Minnesota Rate Cases*, 230 U. S. 352, 462–465; *Missouri Rate Cases*, 230 U. S. 474, 505, 506.) There was testimony with respect to the cost of handling freight over the platform at the Indianapolis terminal, but this fell far short of the showing required, and it appeared that of the six classes of freight, to which the order applied, the fifth and sixth classes constituting much more than one-half in tonnage of the classified freight always moved in carload lots loaded by the shipper.

The evidence showed that the class rates on local traffic on the line between Indianapolis and the Illinois boundary, which were maintained by the Vandalia Company and condemned by the Commission as unreasonable, were higher than the class rates for corresponding distances to local stations in Indiana on other lines (including one of the Vandalia Company's divisions) running out of Indianapolis to the east and south. It wholly failed to sustain the contention that the action of the Commission in ordering the reduction complained of transcended the limits imposed by the Fourteenth Amendment.

*The decree is reversed and the case remanded with direction to dismiss the bill without prejudice.*