**CALIFORNIA RETAIL GROCERS & MERCHANTS ASS'N, Limited, et al. v. UNITED STATES.**

No. 10225.

Circuit Court of Appeals, Ninth Circuit.

Dec. 30, 1943.

Rehearing Denied Feb. 16, 1944.

Moses Lasky, Brobeck, Phleger & Harrison, and E. R. Hoerchner, all of San Francisco, Cal., for appellants.

Tom C. Clark, Asst. Atty. Gen., Frank J. Hennessy, U. S. Atty., of San Francisco, Cal., Charles S. Burdell, Sp. Asst. to Atty. Gen., of Seattle, Wash., and Joseph L. Alioto, Sp. Atty., of San Francisco, Cal., for appellee.

Before GARRECHT, DENMAN, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

Thirteen associations of retail grocers in northern counties of California and nine of their officers appeal from judgments holding them guilty of conspiring to restrain interstate commerce by price fixing in the retail sales of groceries in California in violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1.

The California Retail Grocers and Merchants Association, Ltd., hereafter called the California Association, at all pertinent times had associated with it as affiliates voting for its directors and contributing to its funds the other appellant associations. The Food Trades Institute, Inc. and Food Industry Bureau, Inc., are two corporations formed to enforce and make effective the purposes of the California Association respecting the prices at which wholesalers and retailers of groceries and other merchandise should be sold to San Francisco and Alameda counties. The individual appellants are officers and persons connected with the associations whose major, if not sole, function was the attempt to make effective the California Association's policies.

There is ample evidence from which the district court could infer that each appellant knowingly participated in making effective the price fixing policies and purposes of the California Association. Their several motions below to strike certain evidence on the ground of a failure to show the moving party's participancy in the price fixing scheme were properly denied.

This combination of persons, corporate and otherwise, is shown by the evidence to have acted in their industries in Northern California as did the similar combination headed by the Food and Grocery Bureau of Southern California in the latter area and similarly restrained interstate commerce. Cf. Food and Grocery Bureau of Southern California et al. v. United States, 9 Cir., 139 F.2d 973, this day decided, hereafter called the Southern California case, the opinion in which should be considered in connection with our decision here. We agree with the district court that this associated action in carrying out the policy of the California Association is that of conspirators to violate and who have in fact violated Section 1 of the Sherman Act.

As in the Southern California case, the associates started their activities with the circulation among the Northern California grocers of a declaration of policy of enforcement of what they claimed were the

provisions of the California Unfair Practices Act. Instead of confining their activities to such individual cases as where a particular retailer sells below cost with "intent" to injure particular competitors or to take trade from them or destroy competition, their declared purpose was "price stabilizing" by preventing the sale of any such merchandise below prices fixed by the conspirators.

Also, as in the Southern California case, until in March 1941, when the conspiracy had continued for several years, there nowhere appears in the mass of price lists and other circulated material even the mention of the intent to injure competitors, much less that the Unfair Practices Act was concerned solely with offenses based upon such intent. That the conspiracy was concerned with price fixing without regard to the limitations of that Act is apparent from the following statements of the program for wholesalers, jobbers and retailers:

"Price Stabilizing Program

"Effective With the Opening of Business
"March 26, 1936.

"*No merchandise to be advertised, displayed or sold for less than 6% above invoice or replacement cost, whichever is lower, exclusive of advertising allowance.*

"On taxable items the markup must be 9% as all grocers are in the habit of absorbing the Sales Tax. This will *stabilize prices* between the druggists and grocers as the former charge the Sales Tax and the grocers do not.

"*Prices* are based on delivered cost in San Francisco, but need not include drayage from warehouse to store.

"*Definite minimum prices on butter will be based in accordance with the following schedule.* The Exchange *basic price* which is published in the morning papers will determine the base price to which will be added as follows:

"On San Francisco Mercantile Exchange basic *price* [not cost]:

20½ to 25 cents .04 for solids .05 for cubes
25½ to 30 cents .04½ for solids .05½ for cubes
30½ to 35 cents .05 for solids .06 for cubes
35½ to 40 cents .05½ for solids .06½ for cubes

"For the week end specials the Exchange *price* named Wednesday afternoon and published in Thursday morning papers will be used as the basic price for Thursday, Friday and Saturday, subject to market decline. ["price" not cost]

"The 6% markup will apply on eggs the same as all other items.

"Advertising for butter and eggs must specify quality in accordance with the State laws.

"A list of suggested *minimum prices* on staple items will be published each week in the Grocers Advocate. These prices will indicate selling prices based on the mark up of 6%. It is suggested that these prices be observed, but they will not be binding on dealers who can sell legally at a lower price.

"*Any legal price may be met, provided the intention to do so is reported to the Food Trades Institute, and the Institute's sanction obtained.* This is to *prevent price disorganization* through hasty action in meeting an advertised price which may have been published in error.

"All premiums, free deals, combination sales, lotteries, cash register stars, etc., are to be eliminated on or before March 26, 1936, excepting only special offers made by manufacturers.

" 'Close-outs' sold at less than 6% above cost must be bona fide, must not be re-stocked under six months, and shall be advertised as such.

"This program has been sanctioned unanimously by the larger grocery operators in San Francisco and *assurance has been received from the large drug store operators in San Francisco that the above will be maintained on grocery items sold by them.*

"Any violation of the above will subject you to prosecution under the law." (Emphasis supplied.)

Attached to a letter addressed to firms including wholesalers and jobbers is a "Six Point Program" of which the first point is

"Six Point Program
to become effective on
June 1st, 1937

"1. *The law prohibits sales at less than cost plus cost of doing business.* Until a Wholesaler in this district can establish a cost of doing business that is less than 3%, the MINIMUM mark-up will be 3% on your net cost. This 3% mark-up includes delivery price. In case a Wholesaler has no facilities for delivering, he may make his net f.o.b. warehouse price 2% charging 1% for delivery costs. *This in order to place everyone on an equal basis;* at the

same time establishing a basic cost to the retailer of 3% over your net cost. In calculating your mark-up in instances where you have a fractional part of a cent, your single case price must be the nearest higher cent. However, in quantity deliveries you may take the exact figure.

"Example: 3% to be charged where delivery is made. 2% to be charged ex-warehouse. In no instance do you deduct the cash discount and then add the 2 or 3% mark-up to this net, but calculate as follows:

"San Francisco Jobbers and Jobbers Operating in Their Own Cities

| | Cost | Cash Discount Ex-Warehouse | Ex-Warehouse price plus Delivery |
|---|---|---|---|
| Milk | 2.80 | 2% 10 days 2.80 | 2.80 plus 1%." |

(There follows a number of other items in similar form.)

(Emphasis supplied.)

The California supreme court in July 1936 rendered its decision in Wholesale T. Dealers v. National, etc., Co., 11 Cal.2d 634, 658, 82 P.2d 3, 118 A.L.R. 486, holding that the Unfair Practices Act did not provide for price fixing. Cf. our opinion in the Southern California case. However, that California decision did not change the action of the conspirators, as shown by the document last above. On November 30, 1939, a mimeographed bulletin was sent "To Our Board of Directors, Local Presidents, Secretaries and Individual Members." It first refers to an opinion rendered by the State Association Attorney, E. R. Hoerchner, concerning the giving away of free goods and the relation thereto of the California Unfair Practices Act, and it concludes as follows:

"Enforcing Policy

"After a number of meetings of the secretaries of Northern California (from the City of Bakersfield, north) a general policy of application of the California Unfair Practices Act has been established for enforcement purposes. The basis that all these enforcement agencies will use, is— 10% over dead net maximum quantity cost. Please read this policy statement carefully and advise the trade accordingly.

"*It is the intention of the enforcement provisions to proceed uniformly along this policy line. It is generally considered that no one can sell merchandise below this specified percentage, which includes both wholesale and retail operations. This is an advanced step and should help a great deal toward stabilizing market conditions.*

"Efforts are now being made to establish centralized headquarters, providing sufficient funds can be raised for such uniform centralized policing, thus enabling central headquarters to policy and aid those communities not now coming within the scope of immediate enforcement protection." (Emphasis supplied.)

The California Association followed this up on December 1, 1939, with a mimeographed bulletin commencing as follows:

"Enforcement of the Unfair
Practices Act in Alameda County

"To the Food Industry in Alameda County:

"Effective December 14, 1939, all enforcement agencies in Northern California are establishing a mark-up of 10% over dead net maximum quantity cost, and Alameda County will be no exception to this rule. The stage is all set for strict enforcement of the Unfair Practices Act and field representatives will be in the Alameda County area to police any violations and citations will be requested from the District Attorney's office, *and if the policies contained herein are totally ignored immediate prosecution will take place.* The District Attorney's office in Alameda County has pledged cooperation and in taking over the temporary enforcement for Alameda County, the California Retail Grocers Association means business, and will lend its entire support toward carrying out the statements contained in this communication." (Emphasis supplied.)

This is followed by a statement of certain provisions of the Unfair Practices Act, including part of Section 3, Gen.Laws Cal.1937, Act 8781. The bulletin carefully omits any reference to the provisions of Section 3 which allow all sales below cost if done without an intent to injure competitors.

This bulletin is what is called in common parlance a "lawyer's letter," and the district court was entitled to infer that it was cleverly devised to convince the layman retailer that he would be prosecuted by the conspirators if he made any sale below their calculated "price changes" regardless of the

absence of any intent to injure a competitor.[1]

Appellants have brought their appeals here on this same theory that the Unfair Practices Act is legislation allowing the fixing of minimum prices. Their third assignment of error is that the court denied appellants' motion to dismiss, one of their grounds being "secondly, there is no evidence of any conspiracy or combination to fix prices at levels so high, arbitrary, or noncompetitive that adherence and conformity therewith was not required by the statute of the State of California known as the California Unfair Practices Act."

■ This plea is made to this court despite the fact that the California supreme court seven years before had decided that the Act was not a price fixing Act and gave no license for "adherence" to or "conformity" with fixed prices, even if they

[1] The remainder of this bulletin is

"The State Grocers Association will operate through the Food Industry Bureau of Alameda County for all legal action.

"*Price* changes, if necessary, will be issued every two weeks and will *become effective* each and every second Thursday from date of bulletin. For example, bulletins will be issued (to subscribers of the Food Industry Bureau only) in December on the 4th and 18th, and would *become effective* on the 14th and 28th respectively. Exceptions to this rule will be posted. Therefore, it is suggested that these bulletins be kept for reference purposes.

"Your attention is directed to the new amendments in the Unfair Practices Act. In the event of any violations on or after December 14th, the policy of the Food Industry Bureau office will be to institute proceedings against all violators at once.

"Section 3 of the Unfair Practices Act reads ' "Cost" shall mean the invoice or replacement cost, whichever is lower, * * * plus the cost of doing business.' Section 6, subdivision D of the Unfair Practices Act gives you the right 'in an endeavor made in *good faith* to meet *legal prices* of a competitor * * * selling the *same* article or product.'

"Anticipated discounts, promotional, display, advertising or swell allowances cannot be used in computing minimum resale prices. Do not drop fractions, regardless of how small.

"Section 4 of the Unfair Practices Act reads—'In establishing the cost of a given article or product to the distributor and vendor, the invoice cost of said article or product purchased at a forced, bankrupt, closeout sale, or other sale outside of the ordinary channels of trade may not be used as a basis for justifying a price lower than one based upon the replacement cost as of date of said sale of said article or product replaced through the ordinary channels of trade, unless said article or product is kept separate from goods purchased in the ordinary channels of trade and unless said article or product is advertised and sold as merchandise purchased at a forced, bankrupt, closeout sale, or by means other than through the ordinary channels of trade, and said advertising shall state the conditions under which said goods were so purchased, and the quantity of such merchandise to be sold or offered for sale.' This also includes dents as such merchandise must be listed accordingly if sold below cost as defined in the Unfair Practices Act.

"Section 10, paragraph 3 of the Unfair Practices Act reads 'Any party to, or any witness in, any action brought under any provision of this section may be required to testify and give his deposition as if the provisions of Part IV, Title III, Chapter III of the Code of Civil Procedure were applicable to said party, or witness, and to said testimony and said deposition; *and in addition,* the books and records of any such party, or of any such witness, may be *subpoenaed* into court and introduced into evidence, or introduced, by reference, into evidence, and may be required to be produced at the taking of any such deposition and there inquired into.'

"For further particulars, telephone H. J. Jacobs, Food Industries Bureau, HIgate 6716.

"Summarizing this bulletin, we respectfully ask every food and grocery distributor to study the contents of this bulletin carefully as it means exactly what it says and we are ready to back every statement with legal action, and give any insistent violators an opportunity to present their views in court.

"The enforcement work is for the benefit of the majority of the industry. The law was enacted at the insistence of independent retailers for their protection and is enforced without fear or favor. It is not for the particular favor of any individual, group or clique.

"Very truly yours,
"California Retail Grocers & Merchants Association
"W. A. Hadeler Secretary."
(Emphasis supplied).

were not "high, arbitrary, or noncompetitive."

Pursuant to this price fixing policy there were sent out to the thousands of retailers and wholesalers in Northern California lists of *price* minimums at which merchandise could be retailed. As stated, they did not even suggest that they were *cost* minimums which could be used for nothing else but as rebuttable evidence of a defendant's cost in a suit prosecuting him for selling below his cost with intent to injure competitors. Typical is the following sent by one of the conspirator associations to its members on June 15, 1940:

"Suggested Minimum Prices

"Bulletin prices are suggested as legal minimums, in accordance with best information obtainable, but are not necessarily your selling price. Cost of merchandise, operating costs and your merchandising policy must govern your *regular* selling price." (Emphasis supplied.)

(Then under designations "Canned Milk," "Coffee," "Flour," "Sugar," and "Shortening," appear the names of commodities and prices in the form shown in U. S. Exhibit 13—1.)

"Central California Retail
Grocers & Meat Dealers Association
"I. H. Wallace, Secretary."

With the circulation of these price lists also were letters with the bold statement that the associations' purpose was to carry out a "consolidated program of price stabilization." The California Association wrote identical letters to its members, beginning with the following paragraph:

"Appreciating the critical conditions with regard to retail and wholesale prices in the Northern California territory and immediate need of a *consolidated program of price stabilization,* the Board of Directors of the California Retail Grocers & Merchants Association, in Convention March 6th, 7th and 8th, passed a resolution offering moral support in establishing a Northern California enforcement agency; and further to devise satisfactory means of raising funds to support the consolidated program of enforcement under the requirements of the Unfair Practices Act of the State of California." (Emphasis supplied.)

[2] Again as in the Southern California case, the conspiracy aimed to fix all minimum retail prices whether of an out-of-state wholesaler making an interstate sale or a retailer selling goods he had imported from out-of-the state or intrastate sales by retailers of goods produced within the state. The purpose of the conspiracy was to "stabilize" the entire trade in California in all sales, whether interstate or intrastate.

■ The defendants below sought to introduce evidence that the circulated price lists were based upon cost surveys which were made in accordance with the provisions of Section 5 of the Unfair Practices Act for providing rebuttable evidence in suits prosecuting individuals selling with intent to injure competitors. Their contention appears to have been that if such surveys were made to aid in determining costs in such prosecutions, the conversion of the cost surveys into price lists to fix all sales prices at a universal minimum to stabilize the market brought such price fixing within the Unfair Practices Act. The statement of the contention refutes its claim.

■■ The first appearance of any statement referring to intent was in March 21, 1941, after the conspiracy had been in operation for over five years. It was published in the California Grocers Advocate and read "The Unfair Practices Act prohibits the selling of merchandise below cost but absolutely does *not* guarantee any profit to the retailer. It also stipulates that such loss leader selling must be proven to have been done for the purpose of injuring or destroying competition * * *."

Obviously such a publication could not have the retroactive effect of curing the past wrongful conduct and hence the refusal to admit it in evidence was not error. The court also properly refused to admit and properly struck where admitted the proffered evidence that the cost surveys were the basis of the minimum price lists used to stabilize the market. Assuming this to be true, it did not prove that the conspirators' price fixing "conduct was allowable under the Unfair Practices Act."

The judgments are affirmed.

Affirmed.