COHEN ET AL. *v.* FREY & SON, INC. ET AL.
[No. 140, October Term, 1950.]

588

Decided April 18, 1951.

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Harry Adelberg* and *Simon E. Soboloff*, with whom was *Meredith R. Hoffmaster* on the brief, for the appellants.

*Jacob Blum*, with whom was *Sidney Blum* on the brief, for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree permanently enjoining defendant "from advertising, offering to sell, or selling at wholesale any item of merchandise at prices less than cost to him as defined in the Unfair Sales Act, Article 83, sections 111 to 115 inclusive * * *, with intent to injure a competitor or competitors, or destroy competition, unless such advertisement, offer to sell or sales are made in accordance with and pursuant to the provisions of section 114 * * *." The court filed an opinion which fully discusses the facts and the law of the case, but the decree does not, by reference, embody the opinion as part of the decree. At the argument, when attention was called to the scope of the decree, defendant's counsel said that he had not objected to this feature of the decree

because he thought the decree would not be enforceable. We need not comment on the tactics of the parties, or their underlying strategy, in this respect. It is, however, to be noted that the decree (*a*) is a sweeping, abstract prohibition of violation of the act, without mentioning any conduct which is found to constitute a violation (*New York, New Haven and Hartford Rail Road Company v. Interstate Commerce Commission,* 200 U. S. 361, 402-404, 26 S. Ct. 272, 50 L. Ed. 515; *Rust v. Griggs,* (1938), 172 Tenn., 565, 113 S. W. 2d 733) and (*b*) embodies a plain misconstruction of the act, perhaps not material in this case. It is clear that the act does *not* make it unlawful "to sell at less than cost, *with intent to injure a competitor, unless* the price is made *in good faith* to meet competition." Section 114 provides that the provisions of the act shall not apply to sales "where the price of merchandise is made in good faith to meet competition" or in seven other enumerated cases. Manifestly these eight cases are *not exceptions* to the prohibition of sales at less than cost *with intent to injure a competitor.* Section 114 is a statutory declaration that these eight cases are *not* to be regarded as sales *with intent to injure a competitor.*

This suit was instituted against defendant by Wholesale Grocers Association of Maryland. A demurrer to the bill was sustained, presumably on the ground that the association had no standing to sue. *Dvorine v. Castleberg Corporation,* 170 Md. 661, 668, 185 A. 562; *Maryland Naturopathic Association v. Kloman,* 191 Md. 626, 62 A. 2d 538; *Crider v. Cullen,* 191 Md. 733, 63 A. 2d 618; *Norwood Heights Improvement Association v. Baltimore,* 195 Md. 1, 72 A. 2d 1; *Windsor Hills Improvement Association v. Baltimore,* 195 Md. 383, 73 A. 2d 531, 535. In the amended bill (called "amended petition") the present plaintiffs, three members of the association, were named as plaintiffs instead of the association. An order overruling a demurrer to the amended bill was affirmed by this court. *Cohen v. Frey & Son,* 193 Md. 285, 66 A. 2d 784. The amended bill enumerates twenty-

nine items of merchandise, which it alleges defendant "has been selling at wholesale, and is now selling at wholesale," at specified prices. It also alleges that "pursuant to the Unfair Sales Act, * * * the cost of the said items to the defendant, as defined in section 112 * * *" is as enumerated. Strange to say, the twenty-nine "costs" enumerated in the amended bill are not in fact what the lower court found, and plaintiffs contend, were defendant's "costs, as defined in section 112". The "costs" enumerated in the amended bill do not include the two per cent "mark-up" specified in section 112, (b), (3), as part of "cost to the wholesaler". The allegations of the amended bill, other than those relating to the twenty-nine items of merchandise are substantially in the language of the act, with little or no detail added. The demurrer to the amended bill did not present the questions presented on this appeal. Defendant contends (1) that the act, properly construed, has not been violated by him, and (2) that the act, as construed and applied to him by the lower court, is unconstitutional. *Blum v. Engelman,* 190 Md. 109, 57 A. 2d 421, in which the Unfair Sales Act was held constitutional, was likewise decided on demurrer to the bill, which set out virtually no facts beyond allegations of violation of the act in substantially the language of the act.

The three plaintiffs, Frey, Sachs and Rudo, and defendant are all wholesale grocers in Baltimore. Defendant has been in business, trading as Capital Wholesale Grocery Company, since 1944. Since May 13, 1947 he has also been trading as Self-Service Wholesale Grocery Company. The Capital business is conducted in the usual way, including purchase from manufacturers of goods which are delivered to defendant's warehouse, solicitation of orders by telephone and by personal calls of salesmen, delivery of goods sold, extension of credit, collection of accounts, bookkeeping and keeping other records. Self-Service business is essentially similar to "cash and carry" retail business. The customer takes from bins and assembles the merchandise he desires,

carries it to the front of the building, where the price is tabulated on a cash register tape, and pays for it. Defendant has eight employees (including his son-in-law, a salesman), viz., two salesmen, an office clerk, two drivers and three helpers, who work principally or solely for Capital and two who work principally for Self-Service, handling merchandise from the platform to the bins. The two businesses are conducted in the same building, the two trade names are on the outside of the building.

All merchandise is purchased and paid for, and all salaries and other expenses are paid, in the name of Capital. There is one bank account, in Capital's name. The bank book shows two deposits each day; one is Capital's receipts, the other Self-Service's. In the cash receipts book the cash for each day is segregated between Capital and Self-Service. For the year ended January 31, 1949 gross sales were $1,819,185, $571,667 for Capital, $1,247,517 (68.58 per cent of the total) for Self-Service. Defendant owns the building and charges $4,800 rent as an expense. In an allocation of expenses between Capital and Self-Service for the year ended January 31, 1949, prepared by defendant's accountant, $3,600 rent was allocated to the warehouse (three-fourths of the space) in proportion to sales, 68.58 per cent, $2,468, to Self-Service, $1,131 to Capital, $1,200 to the office (one-fourth of the space), ten per cent, $120, to Self-Service, $1,080 to Capital. Defendant's total expenses, $40,771, which is 2.24 per cent of sales, were allocated, $14,872, which is 1.192 per cent of sales, to Self-Service, $25,895, which is 4.53 per cent of sales, to Capital. Most expenses were allocated, either all to Capital or all to Self-Service, or in proportion to sales, 68.58 per cent to Self-Service; some, applicable almost exclusively to Capital, ten per cent to Self-Service, or ten per cent to both (in proportion to sales), all the rest of Capital. Defendant's son-in-law receives $75 weekly ($3,900 a year), and more at the end of the year, but what he gets is not charged as an expense of the business. Another statement, without itemization or allocation of expenses, but with sales,

cost of goods sold and comparable figures for three prior years, shows a total of $41,539 expenses (a difference of $768), and shows $28,625 discounts received on cash purchases. For the calendar year 1948 the cost to plaintiff Sachs of doing business was approximately nine per cent of gross sales, of which delivery expense was $26,604, sales were $1,210,579, discounts received $17,178. As otherwise expressed by him, his selling expense, and likewise his delivery expense, each were between 2.50 and 2.75 per cent. For the fiscal year ended June 30, 1948, the total of net sales by Frey was $3,802,741, the cost of salesmen's salaries and commissions equivalent to 2.53 per cent, cost of delivery 1.25 per cent, cash discount received, $53,073; sales by Rudo, $3,098,366, salesmen's salaries and commissions 2.52 per cent, cost of delivery 2.9 per cent, cash discount received $43,810.

The first Unfair Sales Act in Maryland, Acts of 1937, ch. 211, was repealed and superseded by Acts of 1939, ch. 248, which was held unconstitutional in *Daniel Loughran Company v. Lord Baltimore Candy and Tobacco Company*, 178 Md. 38, 12 A. 2d 201. In *Blum v. Engelman*, 190 Md. 109, 115, 57 A. 2d 421, 423, we held that the present "Unfair Sales Act [Acts of 1941, ch. 330, as amended by Acts of 1943, ch. 803], prohibiting sales below cost with intent to injure competitors and to destroy competition, promotes a policy within the police power of the State."

Section 112 of the act provides: "112. When used in this Act the following terms shall have the following meanings: * * * * * * (b) 'Cost to the Wholesaler' shall mean the invoice cost of merchandise to the wholesaler or the replacement cost of the merchandise to the wholesaler, whichever is lower; less *all discounts except customary discounts for cash,* to which shall be added: (1) Freight charges not otherwise included in the invoice cost or replacement cost of the merchandise as herein set forth. (2) Cartage to the retail outlet if performed or paid for by the wholesaler, which cartage cost, in the absence of proof of a lesser cost, shall be deemed to be

three-fourths (3/4) of one per cent. (1%), of the cost of the merchandise to the wholesaler, as herein set forth, after adding thereto freight charges, but before adding thereto cartage. (3) A mark-up to cover *in part* the cost of doing business, which mark-up *in the absence of proof of a lesser cost, shall be two per cent.* (2%) of the cost to the wholesaler, as herein set forth, after adding thereto freight charges and cartage, but before adding thereto the mark-up. * * *" [Italics supplied.]

Section 113 provides that "* * * no wholesaler shall, with such intent [to injure a competitor or competitors, or destroy any competition], advertise, offer to sell, or sell at wholesale any item of merchandise at less than cost to the wholesaler, as defined in this Act. *Evidence of any advertisement, offer to sell or sale of any item of merchandise by any retailer or wholesaler at less than cost to him, shall be prima facie evidence of intent to injure a competitor or competitors, or destroy competition.* Upon complaint of any person claiming to be injured, the Circuit Court of any county and the Circuit Courts of Baltimore City shall have jurisdiction to enjoin any such retailer or wholesaler from the commission of any act prohibited by the provisions of this Act." [Italics supplied.] Section 114 provides that the provisions of the act "shall not apply to advertisement or offers to sell, or sales at retail or sales at wholesale * * * (h) Where the price of merchandise is made in good faith to meet competition". The questions presented on this appeal relates to the construction or validity of the above italicized portions of sections 112 and 113 and the above quoted portion of section 114. The only change made in section 112 by the Act of 1943 was change of the mark-up from one to two per cent.

When defendant began the Self-Service business, he mailed printed circulars, showing prices, to a list of all the grocers in the telephone directory. Later he increased his list to about 1,900 of the 3,000 grocers in Baltimore. Some customers buy both from Capital and Self-Service, according as they prefer to get the benefit,

or to save the expense in price, of delivery and credit. Many manufacturers sell directly to retailers at the same net prices (for like quantities, whether carload lots or less) and cash discounts as to defendants and other wholesalers. Defendant says his prices are made to meet such competition, though few or none of his customers are in a position to buy in carload lots as wholesalers do. Many manufacturers also give to retailers, and to wholesalers, an "advertising allowance", conditioned upon the doing of newspaper advertising by the retailers or by the wholesalers' customers, measured not by the cost or amount of the advertising, but by purchases, *e.g.*, six, ten or fifteen cents per case. Defendant gets no advertising allowance because he does no newspaper advertising and has no organization of customers who do. Plaintiffs do get such allowances. For the calendar year 1948 Sachs received $6,032 (less $742) from "Merit Advertising", a name referring to an organization of customers of his, and paid only $3,330 as direct advertising expense. Most manufacturers allow discounts of two per cent, some 1.5 per cent, for cash.

For fifteen of the twenty-nine items of merchandise mentioned in the bill and in the evidence defendant's Self-Service price was exactly the same as the invoice price to him, after deducting any trade discount, but before deducting the discount for cash (two per cent in fourteen cases, 1.5 per cent in one). In other words, these prices were practically equivalent to invoice price, less a two per cent discount for cash, plus a two per cent mark-up. For seven items the Self-Service price is more than the invoice price, for six of the seven less than two per cent more. For the remaining seven items the Self-Service price is less than the invoice price, for four of the seven less than two per cent less. Capital sells at Self-Service prices plus, in some instances two per cent, in other instances ten cents per case. Whether Capital sales at these prices were made for cash is not altogether clear.

The lower court says that, after taking of testimony in September and October, 1949, "the trial was indefinitely postponed to permit the parties to endeavor to simplify the factual situation by stipulations, after submitting to each other the evidence relating to the facts which they respectively proposed to prove." The trial was resumed on April 25, 1950. Most of the facts were proved by stipulations.

Plaintiffs contend, and the court in effect held, that defendant violated the act by making Self-Service sales at less than invoice price to him (without deducting discounts for cash) plus two per cent mark-up, and also by making Capital sales at less than invoice price plus 2.765 per cent mark-up, in both instances with intent to injure competitors, and that these prices of defendant are not justified as "made in good faith to meet competition". Defendant says that, properly construed and applied, the act does justify his prices as "made in good faith to meet competition", and that, as construed and applied to him by the lower court, the act is arbitrary, unjustly discriminatory, and unconstitutional, because it denies him the right, in making Self-Service prices to make allowance for the fact that customers pay cash and their purchases are not delivered, and requires him, in making prices, to add the same mark-ups, two per cent in Self-Service prices, 2.765 per cent in Capital prices, which are required of plaintiffs, though his expenses (he says) are only 2.24 per cent for his business as a whole, and 1.192 per cent for Self-Service and 4.53 per cent for Capital, and Sachs's expense of doing business is nine per cent, or between five and 5.5 per cent for selling and delivery, and Frey's salesmen's expense and delivery expense was 3.78 per cent and Rudo's 5.42 per cent. In other words, the mark-up required of defendant "to cover in part the cost of doing business" is (he says) his actual cost of doing business or much nearer actual cost than is required of plaintiffs.

Regarding the evidence as to defendant's expenses the court says, "I think in the present state of the proof

the apportionment of the expenses cannot be accepted and yet there is no way for the court, from the evidence, to make any change therein. It cannot arbitrarily be assumed that because Self-Service had 68.58 per cent of the dollar volume of sales it should be charged the same proportion of certain expenses. All the apportionments were made by the accountant pursuant to directions of defendant. As no details of the basis were furnished by either witness, it is simply impossible to reach a conclusion with respect to the reasonableness thereof. * * * The combined operating expenses of both branches of the business were found to be incomplete and the method of apportioning the expenses was found to be unsatisfactory and unacceptable. Therefore, it is impossible for the court to determine the cost of doing business of either branch. * * * The third point relates to the effect of the cash discount. Because the list of operating expenses is not accurate or at least is incomplete and the apportionment thereof is not acceptable, the effect of the cash discount should not be determined in this case." When the trial judge has seen and heard the witnesses, special weight is given to his findings of fact. But seeing and hearing witnesses does not help much in determining the credibility of the multiplication tables. This case does not turn on questions of veracity. Differences between our view of the facts and the trial judge's are due to our putting less stress on the imperfections in defendant's accounting and more on the undisputed facts, and perhaps to difference as to the force or validity of the statutory presumption in section 113, and difference as to which and how much of the warring philosophies of various state and federal legislation is reflected in the Unfair Sales Act.

Plaintiffs undertook to prove their case mainly through defendant, his accountant and his records. They were at liberty to ask explanation, or to call witnesses of their own, as to allocations or accounting questions that needed explanation. Without doing either they cannot expect us to disregard, as inaccurate or incomplete, defendant's

expenses of his entire business either because of the $768 difference mentioned or the omission of the son-in-law's $3,900 drawings. Nor can the act be supposed to require the impossible, *e.g.*, perhaps, that defendant "produce accurate data as to the operating expenses of each branch of his business". In an article cited by plaintiffs at the argument and in their brief, authorities on accounting are quoted, Professor Paton to the effect that reconciliation of "the various concepts of cost and methods of measuring costs * * * looks like a hopeless task" and *Van Sickle* on *Cost Accounting* to the effect that it is possible to have several different costs estimated "in accordance with accepted cost accounting theory and practice" and "there is no such thing as an exact cost". *Richard H. Lovell, Sales Below Cost Prohibitions: Private Price Fixing Under State Law,* 57 *Yale Law Journal* 391, 395. Cf. *Lewis v. Cumberland,* 189 Md. 58, 71, 54 A. 2d 319. The burden of allocating expenses of part of an entire business is sometimes almost insuperable. *Cf. The Minnesota Rate Cases,* 230 U. S. 352, 462-467, 33 S. Ct. 729, 57 L. Ed. 1511; *The Missouri Rate Cases,* 230 U. S. 474, 504-507, 33 S. Ct. 975, 53 L. Ed. 1571. In fixing rates by statute or administrative order it is not necessary that each branch of a business yield the same return. *The Pennsylvania Railroad Company v. Public Service Commission,* 126 Md. 59, 94 A. 330; *Lewis v. Cumberland, supra; Capital Transit Company v. Bosley,* 191 Md. 502, 513, 62 A. 2d 267, 272.

It is not arbitrary to assume that certain expenses were proportionate to the sales of defendant's two businesses. To apportion other expenses ten per cent and ninety per cent, or 6.8 per cent (sixty-eight per cent of ten per cent) and 93.2 per cent, may be arbitrary in the sense that it cannot be proved that ten per cent or 6.8 per cent should not be five per cent or fifteen or twenty per cent, but it is reasonable to suppose that truck drivers, who bring in some merchandise (not unloaded from the railroad siding at defendant's warehouse) for both businesses, but are principally engaged in making deliveries

to Capital customers, and office space and employees are of little use to Self-Service, which makes no deliveries, gives no credit and therefore keeps no books except the daily record of cash receipts. This case does not depend upon the exactness or accuracy of defendant's allocation of expenses between Capital and Self-Service. His total expenses for both businesses were 2.24 per cent of sales. If $3,900 and $768 were added, the total would still be less than 2.5 per cent. Manifestly his Self-Service expenses were substantially less, and his Capital expenses substantially more, than the average expenses of both, and the expenses of either were less than plaintiffs' expenses.

To say that Self-Service was selling below cost because it did not charge itself with, but gave its customers the benefit of, non-existent expenses which it saved by selling for cash and making no deliveries, would be as arbitrary and unfair as to require one dealer to charge as much for short tons as others charge for long tons. It would be hardly less arbitrary to say that defendant was selling below cost, but not plaintiffs, because this conclusion can be reached by ignoring the differences between their actual costs and using the same arbitrary mark-up which is equal or much nearer to defendant's actual costs than it is to plaintiffs' larger costs, and also including in costs cash discounts not actually paid but deducted from payments by both plaintiffs and defendant.

In *Blum v. Engelman*, 190 Md. 109, 111, 57 A. 2d 421, 422, we said, "The Unfair Sales Act, like the Fair Trade Act, is aimed at price-cutting." Some courts have found further similarity between such statutes, and have not mentioned essential differences, especially in their relation to such legislation as the Sherman Act and similar statutes in many states—none in Maryland. The common law makes unenforceable, and the Sherman Act, 15 U. S. C. A., § 1-7, forbids, as tending toward monopoly and prevention of competition, all combinations and agreements to fix prices. *United States v. Trenton Potteries Company*, 273 U. S. 392, 47 S. Ct. 377, 71 L. Ed. 700;

*United States v. Masonite Corporation,* 316 U. S. 265, 274, 62 S. Ct. 1070, 86 L. Ed. 1461. The Miller-Tydings Act. 15 U. S. C. A., § 1, which has generally been closely followed in the state Fair Trade Acts, is an explicit exception to the Sherman Act. Within the scope of its subject, viz., sales of commodities which bear trademarks, brands, or names of producers, in specified circumstances, it permits what had been forbidden by the Sherman Act and was not lawful at common law, resale price-fixing, and also compels what had been forbidden and was unenforceable, resale price-maintenance. *Dr. Miles Medical Company v. John D. Park and Sons Company,* 220 U. S. 373, 31 S. Ct. 376, 55 L. Ed. 502.

In this respect the history of sales below cost and the declared purpose, if not the real purpose or the effect, of state Unfair Sales Acts is quite different from the history and purpose of the Miller-Tydings Act and Fair Trade Acts. Congress has made no exception to the Sherman Act to permit price-fixing under the state Unfair Sales Acts. The Robinson-Patman Act (1936), 15 U. S. C. A., § 13, amending section 2 of the Clayton Act (1914), is somewhat similar to Unfair Sales Acts, but does not purport to authorize price-fixing; it has confused the problems of doing business, and enforcing the law, under the Sherman Act, the Clayton Act and the Robinson-Patman Act. In effect, it sometimes seems that one will violate the Sherman Act by maintaining prices or the Robinson-Patman Act by cutting prices. The purpose (whatever has been the effect) of the Clayton Act and the Robinson-Patman Act was to supplement the Sherman Act, not in any respect to repeal or supersede it. It has, however, long been considered that destructive competition, by selling below cost or at discriminating prices, like prevention of competition by price-fixing, tends to monopoly and in the end to high prices. Before and after the Sherman Act some state anti-trust acts had been enacted, and before the Clayton Act state acts forbidding discrimination in prices with intent to injure a competitor. *Central Lumber Company v. South Dakota,* 236 U. S.

157, 33 S. Ct. 66, 57 L. Ed. 164. In the *Standard Oil* and *American Tobacco* cases, mention is made of the use of power "to further monopolize the trade in tobacco by means of trade conflicts designed to injure others, either by driving competitors out of the business or compelling them to become parties to a combination" (*United States v. American Tobacco Company*, 221 U. S. 106, 182, 31 S. Ct. 632, 649, 55 L. Ed. 663), and of acts and dealings which "necessarily involved the intent to drive others from the field and to exclude them from their right to trade". *Standard Oil Company v. United States*, 231 U. S. 1, 70, 31 S. Ct. 502, 522, 55 L. Ed. 619.

In Maryland both the legislature and this court have indicated that the purpose of the Unfair Sales Act was to prevent intentionally destructive competition and not by indirection to permit price-fixing in violation of the Sherman Act. In the Act of 1941 the preamble recites that "the practice of selling certain items of merchandise below cost in order to attract patronage is generally a form of deceptive advertising and an unfair method of competition in commerce"; and "such practices cause commercial dislocation, misleads [*sic.*] the consumers, works back against the farmers, directly burdens and obstructs commerce, and diverts business from dealers who maintain a fair policy"; and "bankruptcy among merchants who fail because of the competition of those who use such methods result in unemployment, disruption of leases, and non-payment of taxes and loans, and contribute to an inevitable train of undesirable consequences, including economic depression"; and "such practice is a medium of eliminating weaker competitors, thus tending to create monopolies". There is no evidence that defendant has ever made use of "loss leaders", the prime evil mentioned in the preamble. Indeed, though the act is applicable in the same terms to retailers and to wholesalers, it is difficult to see how a wholesaler, especially one who does no newspaper advertising himself or through his customers, could use "loss leaders". There may be many retail customers sufficiently unsophisticated

to go to buy "loss leaders" and stay to be deceived by them. But retailers themselves could hardly be deceived by a wholesaler by such a trick of their own trade. Moreover, the evil practice of selling below cost is usually ascribed to the strong as "a medium of eliminating weaker competitors, thus tending to create monopolies". In the instant case the combined volume of both of defendant's businesses is much less than the volume of the business of either Frey or Rudo.

The title of the article above-mentioned, cited by plaintiffs, *"Sales Below Cost Prohibitions: Private Price-Fixing Under State Laws"*, embodies the author's thesis that, whatever the declared purposes of Unfair Sales Acts, their real purpose and their effect is to facilitate price-fixing in violation of the Sherman Act. Some of the courts which have sustained the constitutionality of such acts have expressly held that they are not price-fixing laws. *Wholesale Tobacco Dealers Association v. National Candy and Tobacco Company* (1938), 11 Cal. 2d 634, 82 P. 2d 3, 118 A. L. R. 486; *Carroll v. Schwartz* (1940), 127 Conn. 126, 14 A. 2d 754; *Merchants v. Ormesher* (1939), 107 Mont. 530, 86 P. 2d 1031; *Rust v. Griggs* (1938), 172 Tenn. 565, 113 S. W. 2d 733. In 1941 the United States obtained a consent decree, for violation of the Sherman Act by price-fixing, against a trade association and members, enjoining the members, except by individual suits, from enforcing the Connecticut act or contributing to any organization formed to "police * * * or administer state laws which restrict sales below cost". 57 *Yale Law Journal* 419-420. In two contested cases in California the United States obtained injunctions, against trade associations and members, for violations of the Sherman Act by price-fixing. The California act, unlike the Maryland act and the Connecticut act, provides for industry cost surveys to determine average costs. The Circuit Court of Appeals (following the California Supreme Court) held that the act does not authorize price-fixing and does not prohibit sales below cost except with intent to injure competitors or destory

competition, and also held that when cost surveys under the act are converted into price lists to fix prices, the cost surveys are not admissible in evidence in defense of a charge of violation of the Sherman Act by price-fixing. *California Retail Grocers etc. Association v. United States,* 9 Cir., 139 F. 2d 978, *certiorari* denied 322 U. S. 729, 64 S. Ct. 945, 88 L. Ed. 1564; *Food and Grocery Bureau v. United States,* 139 F. 2d 973. In *People v. Victor,* 287 Mich. 506, 511, 283 N. W. 666, 669, 124 A. L. R. 316, in which an act prohibiting gifts with sales was held unconstitutional, the court remarked that the act "does savor of an attempt to stifle competition by maintaining prices of those dealers already in the business". We do not suggest that compliance with the Maryland act would require violation of the Sherman Act. However, in considering the construction and validity of the Maryland act we need not ignore potentialities of such legislation as a cover for violation of the Sherman Act.

In *Blum v. Engelman, supra,* in reaching the conclusion above-quoted, we said, "It is acknowledged that price-cutting is not an evil in itself. On the contrary, the more intense the competition the greater the likelihood of advantage to the buying public. In fact, there is no reason why a merchant under ordinary circumstances should not have the right to make an absolute gift to his customers if he desires to show generosity or advertise his business. It is only when the object of price-cutting is sinister that the sale of goods at less than cost may constitute an economic evil. Freedom of contract is subject to legislative regulation in the interest of public health, safety, morals or welfare. But such legislation must not be unreasonable, arbitrary, or capricious, and the means selected must have a real and substantial relation to the object sought to be attained. Within these limitations the State is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, whether by promoting free competition by statutes aimed at monopolies or by curbing harmful competition

by fixing minimum prices. *Daniel Loughran Company v. Lord Baltimore Candy & Tobacco Company*, 178 Md. 38, 44, 12 A. 2d 201. It is our conclusion that the Unfair Sales Act, prohibiting sales below cost with intent to injure competitors and to destroy competition, promotes a policy within the police power of the State." The conclusion thus reached is not controlling in the instant case. On the contrary, the reasons by which the conclusion was reached leave open the questions now presented, viz., whether, as construed and applied to defendant, the act is "unreasonable, arbitrary or capricious" or "the means selected have a real and substantial relation to the object sought to be attained". A statute or ordinance or an administrative order may be valid at one time or place under certain conditions, and invalid at another time and place under other conditions. *Kramer v. Baltimore*, 166 Md. 324, 333, 171 A. 70; *Baltimore Transit Company v. Hessey*, 196 Md. 141, 75 A. 2d 76; *Hoffman v. Baltimore*, 197 Md. 294, 79 A. 2d 367. Familiar illustrations of this principle are statutes or orders fixing maximum rates or charges. *Baltimore Transit Company v. Hessey, supra; Lincoln Gas Company v. Lincoln*, 250 U. S. 256, 268, 39 S. Ct. 454, 63 L. Ed. 968; *Newton v. Consolidated Gas Company*, 258 U. S. 165, 174, 42 S. Ct. 264, 66 L. Ed. 538. The principle is equally applicable to fixing minimum charges. If one is forbidden to charge adequate prices he is deprived of his property by being deprived of compensation for it or for the use of it. If he is forbidden to charge for a short ton less than his competitors charge for a long ton, he is deprived of his property by destruction of his business. In *Florida Dry Cleaning and Laundry Board v. Everglades Laundry, Inc.*, 137 Fla. 290, 295, 188 So. 380, 382, a minimum price case, it was said, "There is a distinct difference between delivery and the cash and carry aspect of the laundry and dry cleaning business. The manner and cost of administration in each is materially different and those who prefer to patronize the cash and carry business are entitled to the advantage

of this difference. In fixing a schedule of prices, it is the duty of the Board in the interest of the public to take into consideration these elements and establish a differential in charges between the two methods accordingly."

In *Daniel Loughran Company v. Lord Baltimore Candy and Tobacco Company, supra,* the Unfair Sales Act of 1939 was held unconstitutional. In *Blum v. Engelman, supra,* we said, "The 1939 Act was annulled on account of two provisions. One of these provisions was to the effect that sales 'at prices which cannot be justified by existing market conditions' should not be used as a' basis for computing costs. Laws of 1939, ch. 248, sec. 115 (d). This provision required a dealer to make a survey of 'existing market conditions,' and thereupon determine whether such conditions justified a certain price, and from that price the cost was to be computed. The dealer's computation was not conclusive, and accordingly if his analysis of 'existing market conditions' was not correct, and it was determined in a judicial proceeding that the conditions did not justify the price, then, even though he honestly believed that his survey justified that price, his computation would be rejected, and he would stand as a violator of the law.

"The other provision made it unlawful to offer for sale or sell any merchandise at less than cost 'with the intent, effect or result of unfairly diverting trade from or otherwise injuring a competitor.' Laws of 1939, ch. 248, sec. 116. That provision failed to provide a definite standard by which the dealer could ascertain whether he was complying with the law, because it was impossible to know whether a sale would have the 'effect or result' of injuring a competitor somewhere within the State. The Act violated the rule that the application of a penal statute or the right to injunctive relief should not be a matter of uncertainty and conjecture. It is well settled that a statute which prohibits the doing of an act in terms so vague that persons of ordinary intelligence must necessarily guess at its meaning and differ as to its application violates the constitutional guarantee of due

process of law. *State v. Magaha*, 182 Md. 122, 32 A. 2d 477. The Act of 1939 did not provide a reasonably ascertainable standard of guilt, and thus was not sufficiently explicit to enable a person of ordinary intelligence to ascertain with a fair degree of certainty what sales it intended to prohibit." 190 Md. 112-113. The grounds upon which the Act of 1939 was held invalid are applicable with greatest force to penal statutes. The Act of 1939 contained both penal and injunctive provisions, and the *Loughran* case was an injunction case, not a criminal case. The court said, "For the reasons stated, it is unnecessary to discuss the severability of the injunctive and penal features of the Act, pressed by the appellants in their argument. We hold that it is in conflict with the Constitution of this State, and that such unconstitutionality strikes down both features of the same." (178 Md. 52), and also said, "We are not unmindful that in some states fair trade acts embracing certain of the above dubious terms have been sustained; but at the same time, similar terms in statutes of other states have failed to receive judicial approval." *State v. Packard-Bamberger & Co., Inc.*, 123 N. J. L. 180, 8 A. 2d 291, holding a New Jersey Unfair Sales Act unconstitutional was quoted with approval and *Commonwealth v. Zasloff*, 137 Pa. Super. 96, 8 A. 2d 801, [affirmed, 338 Pa. 457, 13 A. 2d 67, 128 A. L. R. 1120] holding a Pennsylvania act, 73 P. S. sec. 201 et seq., unconstitutional, was cited. Among the Maryland cases cited were *Schneider v. Duer*, 170 Md. 326, 184 A. 914, "in which a legislative enactment requiring that an applicant for barber's license should be a graduate of the eighth grade and have completed a two-year course in a barber school or barber shop, with specifications as to what should be included in the course of instruction, was declared unconstitutional in that it imposed an arbitrary and discriminatory restriction upon the right to follow one's vocation, although it is there recognized that the occupation of barbering is a trade or calling that may be subjected to police regulation so far as the health and

safety of the public is concerned" 178 Md. 45, 12 A. 2d 204, and *Dasch v. Jackson*, 170 Md. 251, 183 A. 534 "wherein a statute designed to regulate the pursuit of the business of paperhanging was declared unconstitutional upon the ground that the Legislature may not, under the cloak of police regulation, place unnecessary restrictions upon those desiring to engage in that vocation". 178 Md. 46, 12 A. 2d 205.

In *Serrer v. Cigarette Service Company*, 148 Ohio St. 519, 76 N. E. 2d 91, the Supreme Court of Ohio affirmed judgments of the Court of Appeals, which affirmed decrees of the trial court for the defendants, denying injunctions on the ground that section 6402-11(c), part of the Unfair Cigarette Sales Act, was unconstitutional. Plaintiffs have stressed differences between the Ohio act and the Maryland act and between the *Serrer* case and the instant case. We are satisfied, however, that for present purposes the two acts, and section 6402-11 (c) of the Ohio act and section 112 of the Maryland act, and the *Serrer* case and the instant case, are not distinguishable. In the *Serrer* case both the trial court and the Court of Appeals filed lengthy opinions. 74 N. E. 2d 841; 74 N. E. 2d 853. The Supreme Court filed a short opinion in which it said, "Upon the trial of the actions, a considerable amount of evidence was offered. Based on such evidence, the trial court found that the defendants' 'cash and carry' price of $1.42 per carton of cigarettes and the delivered price of $1.43 per carton represented amounts below 'cost to the wholesaler,' upon application of the formula contained in Section 6402-11(c), General Code. In addition, the court found from the evidence an intent on the part of the defendants to injure competitors and lessen competition, and that some injury to the plaintiff had been established. However, the court denied the requested injunctions and entered decrees for the defendants on the basis that Section 6402-11(c), General Code, in attempting to prescribe a method for determining minimum sales prices, fails to recognize and provide for cost differentials

between the operations of 'service wholesalers' on the one hand and 'cash and carry wholesalers' on the other, particularly as concerns the item of 'cash discounts' in relation to the other factors of cost included in the definition of 'cost to the wholesaler,' and that hence the statute as it stands is arbitrary, unreasonable and discriminatory, and violates the due-process and equal-protection clauses of the 14th Amendment to the Constitution of the United States and Section 19, Article I of the Constitution of Ohio. The Court of Appeals took substantially the same view of the controversies as did the trial court, and this court finds itself in general accord with the determinations made below. As we view the matter, the infirmity of Section 6402-11(c), General Code, lies in the fact that it is so framed as not to make allowances for the differences in operating costs of different types of wholesalers, with the result that its application creates discrimination in favor of one wholesaler over another. This being so, the statute violates the due-process and equal-protection clauses of the federal and state constitutions, and is, therefore, invalid. Although in this day and age it can hardly be urged that legislative bodies in the exercise of the police power may not, in the public interest and in the promotion of economic stability (annotations, 118 A. L. R. 508 and 128 A. L. R. 1127), prohibit sales at below cost, the legislation enacted to accomplish such objects must be so phrased as to recognize economies and practices whereby one seller is able to sell particular merchandise at a lower price than a competitor and still not be chargeable with selling below actual cost." 148 Ohio St., 521-523. As both of the appellate courts affirmed the trial court it was not necessary for either of them to pass upon the findings of injury to the plaintiff and intent to injure on the part of the defendant. The Supreme Court did not discuss the matter, but the Court of Appeals indicated doubt or disapproval of these findings.

For the reasons already stated, which are in accord with the opinion in the *Serrer* case, we conclude that

the Unfair Sales Act, particularly section 112, as embodied in section 113, is unreasonable, arbitrary and unjustly discriminatory, as between plaintiffs and defendant. We so conclude with respect to defendant's Self-Service business, and also with respect to his Capital business if the evidence can be regarded as showing that Capital sales, delivered on credit, were made at prices below "cost" computed in accordance with section 112. If the evidence can be so regarded, then defendant is selling "below cost", not below his actual cost, but below "cost" determined by an arbitrary formula, which swells his actual cost by ignoring actual cash discounts received and diminishes plaintiffs' actual costs to the extent that they are greater than defendant's. If it be said that any discrimination between defendant and plaintiffs or other competitors is removed by section 114, which exempts from the act prices "made in good faith to meet competition", then the act ceases to be an act to prohibit sales below cost and becomes a price-fixing act, which arbitrarily increases prices of the most efficient and economical dealer and permits prices to be there fixed.

Plaintiffs indeed contend that "to meet competition" must be construed as meaning "to meet lawful competition", so that one could not make—or justify—a price to meet competition without first proving that his competitor's price was not "below cost", as defined, or otherwise unlawful. The Supreme Court, in very different circumstances, has put such a construction upon the materially different provision in the Robinson-Patman Act. *Federal Trade Commission v. Staley Company,* (1945), 324 U. S. 746, 753-754, 65 S. Ct. 971, 89 L. Ed. 1338; *Standard Oil Company v. Federal Trade Commission,* (1951), 340 U. S. 231, 71 S. Ct. 240. But section 114 (h) is practically identical with the language in the original section 2 of the Clayton Act, which was amended by the Robinson-Patman Act. In this respect the original section 2 did not receive the construction recently given to the Robinson-Patman Act. New Jersey, Pennsylvania

and California Unfair Trade Acts contained provisions excepting prices made to meet the "legal price" of a competitor. The California act was held constitutional, but this provision was one of the reasons for holding the New Jersey and Pennsylvania acts unconstitutional. *Supra.* We cannot hold that by omitting the word "legal" the legislature meant to insert it.

We hold, therefore, that the act, as between defendant and plaintiffs, is in conflict with the Constitution of this state. Article 23, Declaration of Rights. Defendant contends (1) that there is no evidence of injury to plaintiffs, (2) that the provision in section 113 as to *prima facie* evidence of intent is unconstitutional, and (3) that in any event his prices were "made in good faith to meet competition". Our conclusion as to section 112, as embodied in section 113, makes it unnecessary to pass upon these contentions. We intimate no opinion as to any of them.

*Decree reversed with costs, and bill dismissed.*