**COUNTY BOARD OF ARLINGTON COUN-
TY, VIRGINIA, et al. v. UNITED
STATES et al.**

No. 597.

United States District Court
E. D. Virginia, Alexandria Division.

Nov. 15, 1951.

Malcolm D. Miller, Washington, D. C., for the plaintiffs.

Gardner L. Boothe, Alexandria, Va., and S. Harrison Kahn, Washington, D. C. for A. B. & W. Transit Co. intervener.

C. H. Johns, Washington, D. C., for the Interstate Commerce Commission.

John H. D. Wigger, Special Asst. to the Atty. Gen., and William P. Woolls, Jr., Special Asst. to the U. S. Atty., Alexandria, Va., for the United States.

Before DOBIE, Circuit Judge, and HUTCHESON and BRYAN, District Judges.

BRYAN, District Judge.

The County Board of Arlington County, Virginia, its members, and an individual patron seek to suspend and set aside[1] an order entered by the Interstate Commerce Commission finding just and reasonable an increase in the fares of the Alexandria, Barcroft and Washington Transit Company for transportation of passengers between Washington, D. C. and points in the Counties of Arlington and Fairfax and the City of Alexandria, Virginia. Concession was made at the bar, during the pre-trial conference, that the findings of fact of the Commission are supported by the evidence. Our inquiry, then, is the legal soundness of the conclusions drawn by the Commission and now assailed by the plaintiffs.

To become effective June 4, 1950, A B & W filed with the Commission schedules of proposed interstate fares between Washington and Virginia, but not within the zone that includes certain Government installations. The increase applicable to the territory of the plaintiffs was generally the addition of 5 cents to each one-way fare. Upon objection by the Arlington County Board and of civic associations along the lines of the Company, the schedules were suspended by the Commission until January 3, 1951. In the interim full hearings were granted to all parties in interest and the examiner's proposed report thereafter filed, followed by the exceptions of the plaintiff Board. On November 10, 1950 Division 2 of the Commission made its report, and therein set forth its findings and its conclusions, holding that, with exceptions unimportant here, the new fares were proper. The same day an order was entered by the Commission, Division 2, vacating its previous suspension of the rates and discontinuing the proceeding. Petition of the County Board for reconsideration by the full Commission was denied in April 1951.

We dispose, in limine, of the complaint of the Commission's procedure. Of certain exceptions filed by the Board to the report of the examiner, Division 2 said, "Requested findings and exceptions, not discussed in this report nor reflected in our findings or conclusions, have been given consideration and found not justified." Reconsideration of the report of its Division 2, the Commission said, was denied because "the evidence of record adequately supports the findings of Division 2." Although the reasons for these rulings are thus unequivocally stated, the County Board insists that Division 2, as well as the Commission, failed to comply with section 8, of the Administrative Procedure Act,[2] by not adding findings and conclusions to support its action in refusing requested findings and its actions in overruling exceptions and refusing reconsideration. The contention is obviously meritless.

██ Condensed, the plaintiff's complaint is that the Commission's conclusion is unbacked by the indispensable jurisdictional finding on fairness and reasonableness,[3] that it was reached without the employment of any approved principle for determining, or any acceptable standard for measuring, reasonable rates, that it ignores passenger interest, and that it depends in part upon intrastate operations. We think the Commission's action securely grounded in fact and in law.

Division 2 definitively found that, A B & W's "operating revenues are less than its reasonable expenses" but when increased to the amounts permitted by the order of November 10, 1950, the fares would be just and reasonable for the transportation described. It computed that the increase would establish a ratio of operating costs to operating income, after income taxes, of 95.6.[4] Explicitly the report declares "the proposed fares * * * are just and reasonable"

1. Secs. 1336, 2321–2325, Title 28 U.S. Code.

2. 5 U.S.C.A. § 1007.

3. 49 U.S.C.A. § 316.

4. This percentage will be slightly greater. It was based upon an assumed raise of fares in the zone of the Government installations to the maximum requested, but subsequent to the instant report, only a partial increase was granted in that zone.

and the "proposed fares * * * do not appear to exceed maximum reasonable fares, and we so conclude."

In coming to its final conclusion the Commission proceeded logically and lawfully. Compelling the ultimate findings are extensive intermediate ones. The transportation demanded, the service provided, the facilities therefor, as well as the existing investment, the capital expenditures made and to be made, dividends paid, the cost and economies of operation, plus the present and predictable revenues, were all subjects of the report. When a rate-making body has thus given thought to the factors recognized as developing a fair rate for a service, its decision must be accepted as a just figure, even though its conclusion may not be premised upon any theorem of price-fixing.[5]

True, operational costs and income predominated in the determination. This was not a matter of choice for the Commission. It was dictated by the nature of the utility under consideration. In following this natural course the Commission manifested an understanding of the methods and modus operandi of the business. For local transportation by bus the principal, and sometimes the sole, capital investment is mobile units. But so severe is their rate of depreciation that the entire investment, if unreplenished, would rapidly disappear. Too, the units demand close, constant, and costly supervision, repair, and maintenance. The necessity for frequent replacements requires that operating costs be heavily and regularly charged to create and maintain a depreciation reserve. Consequently, operating costs are the thing—the first and prime consideration in the ascertainment of what must be collected for the service. In this kind of utility the investment of capital in fixed assets seldom approaches the amount invested in that form by those utilities requiring for their purposes such permanent items as land, buildings, plants, rights of way, tunnels, trackage, depots, wires, poles, mains, reservoirs, or similar long lived properties. Careful appraisement in the latter class of utilities of their capital assets, in order to fix a rate base, is imperative, but it is not so dominant an inquiry for a suburban bus company. A B & W is typical; its chief concern is operating expense.

Accentuation of operating costs in a proper case is known as the operating ratio rule. It is the pattern followed by the Commission here and in many other appropriate instances. Actually it is not a departure from the conventional modes. It is simply a label designating the process of evaluating a service in the light of all relevant factors, but with especial emphasis on the element·of operating expense when the nature of the service makes operating costs the foremost consideration.

The Commission's analysis was painstakingly detailed and comprehensive. It found that in the first quarter of 1950 the revenues fell below those in 1949 for the same period by $110,000, and the expenses in the 1950 quarter were greater by $36,000 than the revenues for that quarter. The quarter was proved to be a safe forecast for the year. The ratio of costs to revenue in the 1950 quarter, before income taxes, was 105, compared with 96.6 for the first quarter of 1949 and 97.3 for the entire year 1949, the last two ratios including provision for income taxes. The losses were also demonstrated through comparative bus-mile expenses and revenues. A loss trend was evident, not to be arrested by the strictest economies—some so drastic as to draw the criticism of the County Board. The Company's equipment-maintenance and garage expense for 1949 was less than for 1948, despite a general .10 cent hourly wage increase. Though bus parts, gasoline, tires, and other items advanced, the 1949 operation and maintenance expenses were also less than the 1948. These same items in the first quarter of 1950 were considerably smaller than for the 1949 quarter. Bus mileage was curtailed each month of 1950 below the corresponding month of 1949.

Officers' salaries were scrutinized, as was the rental paid to the president of

5. Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333.

the Company for the use of his building as a terminal. Depreciation rates were weighed. Thought was given to the possibility of a traffic decline incident to an increase of fares, with the reservation that, if no such decrease was felt, the fares could be readjusted to prevent excessive returns to the Company.

We do not attempt an enumeration of all the matters mentioned by the Commission. Those we have noted sufficiently example the breadth and intensity of the Commission's study.

Summarized, the cost figures found by the Commission disclose these operating results:

|  | 1948 | 1949 | First Quarter of 1950 |
| --- | --- | --- | --- |
| Operating Revenues | $2,855,775 | $2,995,837 | $660,360 |
| Operation Expense | 2,876,338 | 2,913,532 | 696,765 |
| Operation ratio—per centum— after income taxes—and including inappreciable nonoperating income and deductions | 100.7 | 97.3 | 105.5 |

The Commission is not guilty of the unfavorable implication arising from the charge that it pursued a cost-plus method. So used this term infers that cost and profit were its only consideration. Every price-fixing, and a rate determination is nothing more, is finally the sum of cost plus profit. It is unlawful only when it ignores the other factors, and when the cost and profit are not subjected to the refining processes prescribed by law. Instantly, while the fare necessarily is made up of cost and profit, each of these has been pared to conform them to the rules of reasonableness.

Significantly no issue of inadequacy or inefficiency of service has entered this case. Nevertheless, on the patrons' side, the Commission considered the age and number of the busses and the frequency of their schedules in rush hours and non-rush hours. It attentively examined the grievances urged by the citizen associations. Furthermore, the fare zones were measured for equality. But above all, the absence of any reduction in the net re-turn for deficiency in service, or of any request therefor by the plaintiffs, is the most persuasive evidence that every normal requirement of service to the passengers has been met.

Suggestion is made by the Board that the Commission erroneously failed to segregate the interstate from the intrastate revenues and expenses. The argument is that the Commission has not demonstrated that the interstate revenues are insufficient to take care of the interstate costs and to give a fair profit on the interstate business—that the losses may perhaps be rooted in the intrastate business. This argument is not sound. The *inter* and *intra* business are one entire operation, the latter as an integral part of the other. In these circumstances, for rate ascertainments, no separation is helpful. Neither reason nor expediency imposes such an obligation and the law has not.[6]

No omission has been made of the particular considerations enjoined upon the Commission by the statute.[7] Nor has it infringed the statutory prohibition against

6. Illinois Commerce Commission v. U. S., 292 U.S. 474, 483, 54 S.Ct. 783, 78 L.Ed. 1371; Lone Star Gas Co. v. State of Texas, 304 U.S. 224, 241, 58 S.Ct. 883, 82 L.Ed. 1304.

7. 49 U.S.C.A. § 316(i).

the use of "earning power" as evidence or an element of "value of the property" of the carrier [3] for no property here has been so appraised.

The finding of the Commission that the new rates will establish an operating ratio of approximately 95.6 means that it allows a net percentage of 4.4 for profit. The reasonableness of this allowance appeared to the Commission from the facts of the record and hence is not subject to the objection sustained in Washington Gas Light Co. v. Baker [9] as urged by the plaintiffs.

We have reviewed the proceedings on the points made by the plaintiffs, but it must be remembered that we are not deciding the merits of the rate case. Our search reveals that the Commission acted within the law defining its powers and on full and sufficient facts. This ends our inquiry. We are thereafter without jurisdiction to question the Commission's decision.

The defendants in their answers challenge the standing of the County Board and its members in their representative capacity to bring this action. They acknowledge the right of the plaintiff Thomas F. Proctor to do so, as a patron of the bus line. Although the statute [10] gives the County Board and its members the privilege to be heard before the Commission, we have grave doubts of their right to institute a suit of this kind, because they are not directly affected by the order and the public is already represented by the Commission.[11] Nevertheless, as the plaintiff Proctor is conceded that right, we pass upon the case as if all the plaintiffs were properly before the court.

A decree will be entered dismissing the complaint, with costs to the defendants.

3. 49 U.S.C.A. § 316(h).

9. 88 U.S.App.D.C. 115, 188 F.2d 11, certiorari denied 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686.

10. 49 U.S.C.A. § 316(e).

11. Jersey City v. U. S., D.C.N.J., 101 F. Supp. 702; Tyler v. Judges, 179 U.S.

405, 21 S.Ct. 206, 45 L.Ed. 252; U. S. v. Merchants Traffic Ass'n, 242 U. S. 178, 188, 37 S.Ct. 24, 61 L.Ed. 233; Pittsburgh & W. Va. Ry. v. U. S., 281 U.S. 479, 486, 50 S.Ct. 378, 74 L.Ed. 980; Moffat Tunnel League v. U. S., 289 U.S. 113, 53 S.Ct. 543, 77 L.Ed. 1069.