[No. 32491. Department Two. December 28, 1953.]

THE STATE OF WASHINGTON, *on the Relation of Allied Daily Newspapers of Washington, Appellant,* v. THE WASHINGTON PUBLIC SERVICE COMMISSION *et al., Respondents.*[1]

[1]Reported in 265 P. (2d) 270.

*Wright, Innis, Simon & Todd,* for appellant.

*The Attorney General* and *Quinby R. Bingham, Assistant,* for respondent Washington Public Service Commission.

*MacBride, Matthews & Hanify,* for respondent Northwest Greyhound Lines.

DONWORTH, J.—On October 24, 1951, Northwest Greyhound Lines filed with the Washington public service commission a tariff increasing its rate on the intrastate transportation of newspapers from $1.04 to $1.50 per hundred pounds. Allied Daily Newspapers of Washington, a corporation composed of twenty papers whose aggregate circulation equals ninety-eight per cent of the total daily circulation in the state, filed a protest and petitioned the commission to suspend the rate until a full hearing could be held. The commission suspended the rate and set the matter for hearing.

At the close of the presentation of Northwest Greyhound's case before the commission on January 22, 1952, Allied Daily Newspapers challenged the sufficiency of the evidence to support a rate increase and moved for a cancellation of the tariff. The commission reserved its ruling, and after the presentation of evidence by Allied Daily Newspapers the whole matter was taken under advisement. On August

1, 1952, the commission entered its findings and order No. T-8701 denying the motion and approving the rate increase.

In this opinion, the term respondent will indicate Northwest Greyhound Lines, and the Washington public service commission will be referred to as the commission.

The newspaper business by its very nature is dependent upon prompt distribution of its product. To facilitate shipments to localities outside their immediate publishing areas in the least possible time, the newspapers have developed the following system with respondent's co-operation: First, each newspaper desiring to make such shipments determines which bus departures will provide the earliest deliveries to the desired destinations. It then arranges with respondent for the shipment of approximately the same number of papers on each trip so selected. The same shipment will vary in size from day to day, depending upon the number of pages in each edition. The newspaper keeps all records as to the weight of each shipment and on the basis thereof makes periodic settlements with respondent, which issues no shipping receipts or waybills and keeps no accounting records. The papers are fastened in compact bundles by the shipper, marked according to destination, and delivered to respondent bus company, which loads and unloads them. The rate for transportation of newspapers is based on the weight thereof regardless of the distance to point of destination.

Under this system, respondent carries the papers only when adequate space is available on its busses. Baggage, express shipments, and mail all have priority over papers as to space available. Respondent is not liable for any loss or damage to the papers.

The papers are usually carried in the baggage compartment of the bus except small bundles that are to be dropped off along the main route. In such instances, the bundles may be carried on the floor near the driver, so that he can drop them off at the required destinations with the least inconvenience. Passengers may or may not be picked up or discharged at these stops.

The rate for the shipment of newspapers has always been less than for express items because they are easier to handle, require no paper work of any kind, and, as previously mentioned, are carried on a nonliability, space-availability basis.

After the hearing above referred to, the commission by its finding of facts and order made certain findings, determined that the $1.50 rate per one hundred pounds of newspapers was reasonable, and adjudged that it become effective.

Upon appellant's application, a writ of review was issued by the superior court for Thurston county. After a hearing upon the commission's record, the court entered a judgment affirming its order and vacating the writ of review. From this judgment, relator has appealed to this court.

Appellant's six assignments of error are founded upon a single contention urged throughout the proceedings, to-wit: that respondent failed to sustain the statutory burden of proof to show that the proposed rate was just and reasonable. See Rem. Supp. 1941, § 10424 [*cf.* RCW 80.04.130]. It is argued, therefore, that the commission's order was arbitrary, capricious, unlawful and void.

■ The scope of judicial review in such matters was defined in *State ex rel. Model Water & Light Co. v. Department of Public Service,* 199 Wash. 24, 90 P. (2d) 243, as follows:

"The findings of the department are to be given the same weight accorded to any impartial tribunal, and may not be overturned unless the clear weight of the evidence is against its conclusions, or unless it has mistaken the law applicable to the matter adjudicated, or, as sometimes expressed, unless the findings show evidence of arbitrariness and disregard of the material rights of the parties to the controversy."

This rule has subsequently been cited with approval in the cases of *State ex rel. Oregon-Washington R. & Nav. Co. v. Walla Walla County,* 5 Wn. (2d) 95, 104 P. (2d) 764; *Manlowe Transfer & Distributing Co. v. Department of Public Service,* 18 Wn. (2d) 754, 140 P. (2d) 287, 155 A. L. R. 928; *State ex rel. Pacific Tel. & Tel. Co. v. Department of Public Service,* 19 Wn. (2d) 200, 142 P. (2d) 498 and *De-*

*partment of Transportation v. Snohomish County*, 35 Wn. (2d) 247, 212 P. (2d) 829.

The history of rail and bus rates for transporting newspapers may be concisely stated as follows: Prior to February 1, 1947, the railroad intrastate rate for newspapers was 90¢ per hundred pounds regardless of distance. At that time, the rate was increased to $1.04. This rate remained in effect until September 24, 1950, when the present rate of $1.25 was put in effect.

From 1930 to 1947, the intrastate bus rate was $1.00 per hundred pounds of newspapers regardless of distance. On June 15, 1947, the rate was increased to $1.25. This rate was in effect only until September 1, 1947, when a compromise was effected between respondent and a newspaper association (appellant neither admits nor denies being a party thereto) whereby a rate of $1.04 was agreed upon for both intrastate and interstate transportation of newspapers. This rate was identical with the then existing rail rate. The tariff filed by respondent which is the subject of this litigation would increase the bus rate from $1.04 to $1.50 per hundred pounds of newspapers.

We will briefly discuss the evidence to the extent necessary to an understanding of the legal questions raised by appellant's assignments of error.

Mr. James Neely, the administrative assistant to the president of Northwest Greyhound Lines and assistant secretary of the Greyhound Corporation, was the chief witness for respondent. He identified, explained, and elaborated upon respondent's six exhibits which were relied upon to show that the proposed rate increase was just and reasonable. Four of them consisted of figures (taken from respondent's books of account) showing itemized expenses of operation and maintenance, the operating income from all sources with special emphasis on the transportation of newspapers. These exhibits were broken down to show actual dollars and cents, percentages and costs per mile of operation and were based on a comparison between the first ten months of 1940 and the same period in 1951.

Generally, these figures showed substantial increases in both expenses and income since 1940, but, while the percentage of income derived from most items remained fairly constant, that derived from the transportation of newspapers dropped from .89 of one per cent in 1940 to .43 of one per cent in 1951. The exhibits showed that, if the proposed increase had been in effect during the first ten months of 1951, newspaper revenues would have amounted to .62 of one per cent of the total revenues or $36,877.50. Respondent estimated the costs which would be incurred in earning that sum at $34,736. This figure represents .62 of one per cent of the total costs. On the basis of these figures, respondent contended that its profit for transporting newspapers for the first ten months of 1951 would have been $2,141.50 if the proposed increase had been in effect. Respondent would thus have made $5.80 profit from every $100 collected for transporting newspapers as compared with $6.50 profit from every $100 collected for the system's entire operations.

Respondent's figures were based on a comparison of ten months operations rather than a full year because no figures were available for the last two months of 1951 at the time the exhibits were prepared. No explanation was given as to why 1940 was chosen as a base period instead of 1947, which was the year of the last rate increase.

On cross-examination, Mr. Neely stated that he had no statistics at hand to show the increases in costs since 1947. The next day he was recalled to the stand and testified that, between 1946 and 1950, respondent had a 22.65 per cent increase in driver's wages, a 39.97 per cent increase in mechanic's wages, and an increase in depreciation costs on busses from 1.97 cents per mile in 1946 to 3.55 cents per mile in 1950. In 1951, respondent had an additional increase in wages amounting to roughly ten per cent. Wages are 65 to 70 per cent of total expenses.

There was also some evidence comparing bus rates and convenience of service with other carriers. Respondent also introduced in evidence two exhibits, one of which showed

the average monthly income derived from individual newspapers in the state and the other a history of bus company rates for the transportation of newspapers and express items since 1930.

Respondent's operations are not confined to the state of Washington but extend to Vancouver, British Columbia, on the north, to Portland, Oregon, on the south, and across Idaho and into Montana on the east. All of the statistical data introduced in evidence at the hearing before the commission was based on the operations of the system as a whole. No attempt was made to segregate the intrastate properties, expenses, or revenues of respondent. Likewise, respondent made no attempt to show the exact cost of transporting newspapers as a specific item.

The commission made the following finding:

"10. Respondent's exhibits cover the entire system operations. There is no separation of the costs of operation between interstate and intrastate traffic, nor is there a segregation of the costs of transporting newspapers from the costs of transporting other items producing revenue, except upon proportionate revenue basis. Respondent allocates its costs on the basis of revenue produced rather than on the cost of service of handling a specific item. There is no possible method of cost accounting to determine these proportionate costs other than on the basis of the revenue produced. It is a practical impossibility to segregate costs specifically to the transportation of any of the items producing income. The only possible means of attempting to segregate the costs of handling newspapers for the purpose of indicating the net return applicable to newspaper transportation is on a proportionate revenue basis. Neither is it possible to make a segregation of costs of operation between interstate and intrastate traffic for the same reasons. If such segregation were possible it would show that the company's costs of operation are higher for the State of Washington than they are for the system."

Appellant challenges the correctness of the latter part of this finding wherein the commission found that it was not possible to make any segregation of the costs of operation between interstate and intrastate traffic and that "it is a

practical impossibility" to segregate costs of transporting newspapers except by the proportionate revenue system.

As we read the record the precise wording of the finding as to impossibility is not literally supported by the evidence. Although Mr. Neely first explained the failure to produce such figures on the ground that it was "impossible" to do so, he later corrected himself and said that it was not impossible but was "not feasible" or was "very impractical." Reading the finding as modified to mean very impractical, we will consider the legal questions raised by appellant's assignments of error.

The first question to be determined is whether or not, in spite of such finding of impracticability, respondent was required by law to prove the exact cost of transporting newspapers in order to show that the proposed increase was just and reasonable.

In 1951, the legislature amended the statutory power of the commission with regard to a determination of just and reasonable rates. RCW 81.04.250, in so far as it is important to a proper determination of this case, reads:

"In the exercise of said power the commission may in its discretion give consideration in lieu of other factors to the following:

"(1) To the effect of such rates upon movement of traffic by such carriers;

"(2) To the public need for adequate transportation facilities, equipment and service at the lowest level of charges consistent with the provision, maintenance and renewal of such facilities, equipment and service; and

"(3) To the carrier need for revenue of a level which under honest, efficient and economical management is sufficient to cover the cost (including all operating expenses, depreciation accruals, rents and taxes of every kind) of providing adequate transportation service, plus an amount equal to such percentage of said cost as shall be reasonably necessary for the provision, maintenance and renewal of said transportation facilities or equipment and a reasonable profit to the carrier. The relation of carrier expenses to carrier revenues may be deemed the proper test of a reasonable profit."

■ Previously, in the case of *South Bay Motor Freight Co. v. Schaaf*, 3 Wn. (2d) 466, 101 P. (2d) 584, this court had adopted the following rule, the first paragraph of which was taken from 13 C. J. S. 654, § 285:

" 'There is no precise formula for determining with fine accuracy the point of reasonableness of a carrier's rates. There are many factors entering into the consideration; and the final result is to be determined, not from the consideration of a single circumstance, but from a general view of all conditions affecting the transportation, and a consideration of all parties directly and materially affected.'

"There are many recognized factors entering into the determination of fair and reasonable rates, among them being cost of transportation to carrier, value of property devoted to the service, value of service to the public, earnings, operating expense, competition, and others."

With these general standards in mind, we turn to appellant's argument that respondent has failed to prove that the proposed increase was just and reasonable in the absence of any evidence showing the exact costs of transporting newspapers. The proportionate revenue method of computing costs is said to be incompetent because it allocates a proportion of such expenses as those for air conditioning, heat, chairs, waiting rooms, rest rooms, ticket booths, and information service to the transportation of newspapers when such expenses are entirely unnecessary for the hauling of newspapers. It is, therefore, contended that no part of such expenses and only a reasonable proportion of necessary expenses, based on a comparison of the weight or volume of newspapers with that of passengers and other freight, should be charged to the transportation of newspapers.

In support of its argument that the proportional revenue method of computing costs is incompetent, appellant cites *Wood v. Vandalia R. Co.*, 231 U. S. 1, 58 L. Ed. 97, 34 S. Ct. 7. The court described the scope of the order of the Indiana railroad commission in the following statement:

"The order applied to that portion of the Vandalia Company's road which lay between Indianapolis and the western boundary of Indiana, a distance of about eighty miles, which

originally belonged to the Terre Haute and Indianapolis Company. The order was further limited to the freight traffic moving on 'class rates,' that is, to the traffic, having its origin and destination on this part of the Company's line, which was embraced in the six classes of the 'official classification' as theretofore established by the Company. The existing class rates were found by the Commission to be unreasonably high and the maximum rates in question were ordered to be substituted as just and reasonable."

In holding that appellant railroad had failed to prove that the new rates set by the commission deprived it of its property without due process of law, the court further stated:

"It is plain, however, that it does not follow from the mere fact that the total operating expenses of a railroad, or of a division of a railroad, bear a given relation to the entire receipts of that road or division, that the cost of transportation in the case of a particular class of traffic bears the same relation to the revenue derived from that class."

While recognizing the soundness of that rule as applied to the circumstances there existing, we do not believe that it is controlling under the facts of this case.

Respondent is primarily engaged in the transportation of passengers and incidentally provides facilities for their personal baggage. The transportation of freight items (mail, express shipments, newspapers and baggage in excess of one hundred fifty pounds) constitutes a very minor part of the business. Respondent's total-system figures for the first ten months of 1951 show that passenger and special bus revenues accounted for over ninety-five per cent of total revenues, while those from the transportation of the items of freight mentioned above totaled less than five per cent. Under the system worked out between the parties to this proceeding, respondent devotes none of its facilities exclusively to the transportation of newspapers and is not required to keep any records as to weight of shipments, destinations, length of hauls, number of schedules utilized, volume of space occupied in comparison with other freight items and passengers, or the charges made for such service.

Newspapers must bear their fair share of the common costs of transportation, but the above mentioned factors

make any exact computation of the costs of transporting newspapers very impractical. Even if such an attempt were to be required, it would necessarily involve many more or less arbitrary allocations even under present systems of cost accounting. While the cost of the service is one element in the determination of a just and reasonable rate, it is not controlling except to the extent of indicating a minimum below which a rate may not legally be made. Watkins, Shippers and Carriers (4th ed.) 178, § 90.

In the case of *Baltimore & Ohio R. Co. v. United States,* 298 U. S. 349, 80 L. Ed. 1209, 56 S. Ct. 797, the court in discussing a similar problem said:

"The burden on appellants, heavy though it is, does not require them to prove with arithmetical accuracy the cost of the transportation covered by the challenged divisions or the value of the property used to perform it, or the proportion attributable to that service. It is enough, if the evidence preponderating in their favor reasonably warrants findings sufficient to support the decree sought. Many issues as to which demonstrable accuracy is impossible have to be decided by the courts. In ascertaining cost of transportation of one out of many commodities hauled by railroads it is impossible to attain precision. Mere lack of it is not ground for objection either to the evidence offered or the facts which it tends to prove."

No court decisions dealing directly with the peculiar facts here involved have been discovered. Although the decisions of various tribunals charged with the determination of just and reasonable rates are conflicting, the interstate commerce commission granted an increase under very similar conditions in its decision of *Newspapers in Baggage Cars, etc.,* 104 I. C. C. Reports 527, saying:

"The characteristics of the traffic as outlined above are so varied as to weights and revenue per shipment, length of hauls, volume of tonnage, and methods of handling and diffusion, that it would be impracticable to attempt to determine the reasonableness of a flat charge by allocations of costs of transportation. Therefore, no discussion of the evidence with respect to the portion of labor costs of baggagemen fairly attributable to the newspaper traffic is deemed necessary."

█ For the reasons stated above, an exact computation of costs was not absolutely necessary, and the evidence produced was not rendered incompetent solely because it contained an allocation of costs in proportion to revenue earned.

Appellant further challenges the competency of the evidence on the ground that no segregation was made between intrastate properties, revenues, and expenses and those connected with respondent's interstate business. In support of the argument that such a segregation is necessary, appellant relies principally upon the case of *Smyth v. Ames,* 169 U. S. 466, 42 L. Ed. 819, 18 S. Ct. 418, wherein the court said:

"In our judgment, it must be held that the reasonableness or unreasonableness of rates prescribed by a State for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier, or to the profits derived from it. The State cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the State has no control. Nor can the carrier justify unreasonably high rates on domestic business upon the ground that it will be able only in that way to meet losses on its interstate business. So far as rates of transportation are concerned, domestic business should not be made to bear the losses on interstate business, nor the latter the losses on domestic business. It is only rates for the transportation of persons and property between points within the State that the State can prescribe; and when it undertakes to prescribe rates not to be exceeded by the carrier, it must do so with reference exclusively to what is just and reasonable, as between the carrier and the public, in respect of domestic business."

The supreme court required segregation of intrastate business in the later cases of *Simpson v. Shepard* (The Minnesota Rate Cases), 230 U. S. 352, 57 L. Ed. 1511, 33 S. Ct. 729; *Northern Pac. R. Co. v. Department of Public Works,* 268 U. S. 39, 69 L. Ed. 836, 45 S. Ct. 412 and *Smith v. Illinois Bell Tel. Co.,* 282 U. S. 133, 75 L. Ed. 255, 51 S. Ct. 65.

In each of the four cases just mentioned, the public utility was operating complex and physically extensive plants doing both intrastate and interstate business, and in each case the utility attacked as confiscatory the intrastate rates fixed by the state regulatory body. The holding in each case that the property used, the revenue received, and the costs incurred in intrastate business must be segregated in determining whether the intrastate rates fixed were adequate, seem to have been based upon two propositions: first, that an insufficient rate for intrastate business cannot be justified on the theory that it was offset by more than an adequate income from interstate business, and secondly, that a possible conflict between state and Federal regulatory agencies must be avoided.

However, the supreme court has modified the rule requiring such segregation in certain later cases where particular facts or circumstances required. In *Illinois Commerce Commission v. United States,* 292 U. S. 474, 78 L. Ed. 1371, 54 S. Ct. 783, the interstate commerce commission had directed that the intrastate rates for railroad car switching in the Chicago switching district, which lay partly in Illinois and partly in Indiana, should be raised to the level of the interstate rates for the same service. Certain shippers and the Illinois commerce commission objected. The case reached the supreme court, where, after reviewing the evidence which showed that the two classes of traffic were inextricably intermingled and handled in the same manner indiscriminately (often on the same train and by the same crew), the commission's order was affirmed, the court saying:

"Where the conditions under which interstate and intrastate traffic move are found to be substantially the same with respect to all factors bearing on the reasonableness of the rate, and the two classes are shown to be intimately bound together, there is no occasion to deal with the reasonableness of the intrastate rates more specifically, or to separate intrastate and interstate costs and revenues."

In *Lone Star Gas Co. v. Texas,* 304 U. S. 224, 82 L. Ed. 1304, 58 S. Ct. 883, and *Colorado Interstate Gas Co. v. Fed-*

*eral Power Commission,* 324 U. S. 581, 89 L. Ed. 1206, 65 S. Ct. 829, the supreme court again held that it was unnecessary to segregate the intrastate and interstate operations in order to determine the reasonableness of rates. Both cases involved rates charged by natural gas companies. In the first case, the Texas commission had attempted to establish intrastate rates and in the latter case the Federal power commission had approved certain interstate rates. In both cases, the court reviewed the factual situation, determined that the utility involved was operating as an integrated system, with properties devoted to both intrastate and interstate business, making any segregation difficult and unnecessary.

The rule to be derived from these cases is that a segregation of intrastate and interstate properties, expenses, and revenues is not necessary in all cases. A state regulatory commission can legally consider the entire operation of a utility where it is an integrated system with its intrastate and interstate business intimately bound together, provided that the commission restricts itself to the fixing of rates over which it has jurisdiction without interfering with Federal authority.

For other cases holding such segregation unnecessary, see *Washington Southern R. Co. v. Commonwealth of Virginia,* 112 Va. 515, 71 S. E. 539; *County Board of Arlington County, Virginia v. United States,* 101 F. Supp. 328; and *Leeman v. Public Utilities Commission of Dist. of Columbia,* 104 F. Supp. 553.

In the instant case, the proposed rate increase is confined to intrastate rates and, therefore, places no burden on interstate commerce. Furthermore, respondent's business is confined mainly to the state of Washington and is operated as an integrated system, with the interstate operations constituting an integral part of the whole and making any segregation very difficult. On the authority of the cases cited above, we hold that none was necessary in this case.

The commission, pursuant to the authority vested in it by RCW 81.04.250, considered many factors in arriving at

its determination that the proposed rate was just and reasonable. We are of the opinion that, under the circumstances here presented, respondent's evidence was competent and sufficient to support the findings and order of the commission. From our examination of the record, we cannot conclude that the commission acted arbitrarily or capriciously or that it proceeded on a fundamentally wrong basis. Having come to this conclusion, our function in the premises is exhausted. *Great Northern R. Co. v. Department of Public Works,* 161 Wash. 29, 296 Pac. 142.

The judgment of the trial court upholding the commission's order and dismissing the writ of review is hereby affirmed.

GRADY, C. J., SCHWELLENBACH, HAMLEY, and FINLEY, JJ., concur.

[1]Reported in 265 P. (2d) 286.