(640 P 2d 335)

No. 53,665

ELKHART TELEPHONE CO., INC., *Appellant,* v. THE STATE CORPORA-
TION COMMISSION OF THE STATE OF KANSAS; RICHARD C. "PETE"
LOUX, Chairman and Commissioner; JANE T. ROY, Commis-
sioner; PHILLIP R. DICK, Commissioner; and their respective
successors in office, *Appellees.*

Opinion filed
February 4, 1982.

*Thomas E. Gleason* of Thomas E. Gleason, Chartered, of Ottawa, for the
appellant.

*LuAnn C. Dixon,* assistant general counsel, and *Brian J. Moline,* general coun-
sel, for the appellees.

Before FOTH, C.J., SPENCER and MEYER, JJ.

SPENCER, J.: In this matter, we are required to review an order of
the Kansas Corporation Commission by which it denied the
utility an increase in rates.

Elkhart Telephone Co., Inc. (Elkhart), is a public utility within
the meaning of K.S.A. 66-104, which furnishes local exchange
and toll telephone service to approximately 1148 customers in
southwest Kansas. Its business is both interstate and intrastate.
Approximately 48 percent of its investment in facilities and the
revenues and expenses associated therewith were allocated to
interstate operations under the provisions of the NARUC-FCC
Separations Manual. The KCC found it necessary to separate
interstate and intrastate operations "to avoid jurisdictional con-
flicts between state and federal regulatory agencies and to avoid

discriminatory rates which result in one class of ratepayers subsidizing another."

On December 3, 1980, Elkhart filed its original application requesting permission to put into effect rate schedules to produce additional gross revenues of $74,731. This was tied to a rate base of $854,275, an overall rate of return of 10.62 percent, and a rate of return on equity of 13 percent.

Duzel D. Yates, a senior utility regulatory auditor for the KCC, testified that in connection with his investigation of Elkhart's application, it was discovered Elkhart had not separated the interstate and intrastate portions of its operations. Staff did so, using an existing separations study prepared by an independent accounting firm for Elkhart. This study, based on the NARUC-FCC Separations Manual, determined Elkhart's costs of providing services handled jointly with Southwestern Bell. Essentially, this is termed the "toll" service and includes both interstate telephone calls and intrastate calls outside Elkhart's local "exchange" area. The study was used as a basis for dividing the revenue for such "toll" calls between Elkhart and Southwestern Bell. Staff used the factors developed by this study to separate Elkhart's rate base, revenues, and expenses, into intrastate (both "exchange" and "toll") and interstate. This resulted in a "Kansas jurisdictional rate base" of $430,569 and net income of $53,920 for the test year. Elkhart was therefore already earning a 12.52 percent overall rate of return on its intrastate rate base. An examination of the company's capitalization with the adoption of the requested 13 percent return on equity showed that only an 11.31 percent overall rate of return was needed. Thus, for the test year, Elkhart had intrastate revenues in excess of its requirement. On cross-examination, Yates stated that to his knowledge, the Commission had never before required separation of interstate and intrastate operations for independent telephone companies.

Bob Boaldin, president and manager of Elkhart, testified the company received revenues for its "toll" services under a settlement agreement with Southwestern Bell and that the agreement was based on a toll cost study, apparently the same study referred to by Yates. Under the agreement, Elkhart earns Southwestern Bell's rate of return (8.4 percent for the test year in question) for such toll service. This is disadvantageous to Elkhart, however, because it has a higher cost of debt than Southwestern Bell and a

lower plant investment per station. In rebuttal to Yates' testimony, Boaldin stated that, although Elkhart agreed there should be a separation of interstate from intrastate operations, such did not affect the request for overall dollar relief. Thus, if separation was required, the company requested a higher overall rate of return and return on equity than had been sought in the original application.

Larry D. Cheeseman, a management consultant hired by Elkhart, also testified in rebuttal to Yates. He noted that Elkhart's modified request, if separation was taken into account, was for $67,720 in additional revenues, with a 19.8 percent return on equity and a 14.4 percent overall rate of return. He stated that separation was unfair to Elkhart because it had high interest debt which could not be paid with the return it received under the toll settlement agreement with Southwestern Bell. "Therefore, an adequate return on intrastate service does not provide sufficient income to meet earning requirements established by commercial lending institutions. . . . It is not possible to obtain a loan only on intrastate service; rather the loans are made on a total company basis."

The Commission adopted the rationale of Yates and denied relief in toto. In doing so, the Commission adopted as a reasonable overall rate of return the existing rate of 12.46 percent disclosed in Staff's computations. Elkhart filed a timely motion for rehearing which was denied, then filed its application for judicial review with this court.

Elkhart first contends the order requiring separation of its interstate and intrastate operations is unlawful and unreasonable under the statutory standard of K.S.A. 66-118d. It also contends the order results in confiscation of its property without due process of law. Rules governing review by this court under the statutory standards were set forth in *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d 376, 380, 595 P.2d 735, *rev. denied* 226 Kan. 792 (1979). The standard of review under the confiscation argument was addressed in *Kansas-Nebraska Natural Gas Co. v. Kansas Corporation Commission,* 4 Kan. App. 2d 674, 675, 610 P.2d 121, *rev. denied* 228 Kan. 806 (1980):

"The statutory standard of K.S.A. 1979 Supp. 66-118d requiring 'reasonable' utility rates is higher than the constitutional standard for due process. In other

words, a rate cannot be confiscatory if it is reasonable. Therefore, even if the scope of review is broader for a due process complaint, a determination that a rate order is reasonable would logically preclude consideration of an allegation of confiscation. In *Power Comm'n v. Hope Gas Co.,* 320 U.S. 591, 88 L.Ed. 333, 64 S.Ct. 281 (1944), the U.S. Supreme Court said, 'If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry . . . is at an end.' *Hope,* 320 U.S. at 602. The Court also said, 'Since there are no constitutional requirements more exacting than the standards of the Act, a rate order which conforms to the latter does not run afoul of the former.' *Hope,* 320 U.S. at 607. Accordingly, our review is limited to the statutory standard of K.S.A. 1979 Supp. 66-118d."

The cases establishing the principle of separation were discussed most recently and perhaps most thoroughly in *United States v. RCA Alaska Communications, Inc.,* 597 P.2d 489, 499-506 (Alaska 1978). It was there noted that separation of intrastate and interstate operations has been required by the United States Supreme Court for two related reasons: (1) to avoid jurisdictional conflicts between state and federal regulatory agencies, and (2) to avoid discriminatory rates which result in one class of ratepayers subsidizing another.

The starting point for the first line of cases is *Smith v. Illinois Bell Tel. Co.,* 282 U.S. 133, 148-149, 75 L.Ed. 255, 51 S.Ct. 65 (1930), wherein the court stated:

"The separation of the intrastate and interstate property, revenues and expenses of the Company is important not simply as a theoretical allocation to two branches of the business. It is essential to the appropriate recognition of the competent governmental authority in each field of regulation. . . . But the interstate tolls are the rates applicable to interstate commerce, and neither these interstate rates nor the division of the revenue arising from interstate rates was a matter for the determination either of the Illinois Commission or of the court in dealing with the order of that Commission. The Commission would have had no authority to impose intrastate rates, if as such they would be confiscatory, on the theory that the interstate review of the Company was too small and could be increased to make good the loss. The interstate service of the Illinois Company, as well as that of the American Company, is subject to the jurisdiction of the Interstate Commerce Commission. . . . The proper regulation of rates can be had only by maintaining the limits of state and federal jurisdiction, and this cannot be accomplished unless there are findings of fact underlying the conclusions reached with respect to the exercise of each authority. In view of the questions presented in this case, the validity of the order of the state commission can be suitably tested only by an appropriate determination of the value of the property employed in the intrastate business and of the compensation receivable for the intrastate service under the rates prescribed."

The *RCA Alaska* court analyzes the *Smith* line of cases as follows:

"Some courts have viewed *Smith v. Illinois Bell* as establishing a strict separations requirement. However, in other utility contexts, the Supreme Court has suggested that some flexibility may be permissible." 597 P.2d at 502.

See *Colorado Interstate Co. v. Comm'n,* 324 U.S. 581, 89 L.Ed. 1206, 65 S.Ct. 829 (1945); *Lone Star Gas Co. v. Texas,* 304 U.S. 224, 82 L.Ed. 1304, 58 S.Ct. 883 (1938); *Illinois Commerce Comm'n v. U.S.,* 292 U.S. 474, 78 L.Ed. 1371, 54 S.Ct. 783 (1934).

"As we read these later cases, the Supreme Court has indicated that the jurisdictional concerns articulated in *Smith v. Illinois Bell Telephone* are not an absolute bar to considering total company operations in setting rates. This flexibility appears most likely to be invoked when (1) the utility is a highly complex, fully integrated enterprise, (2) the agency avoids evaluating the rates which are not within its jurisdiction, and (3) the agency uses a rational approach to allocating costs, etc. to the regulable side of the business (in the absence of a separations methodology). However, the jurisdiction/preemption thread running through these opinions is supplemented by a separate line of reasoning which provides another basis for requiring a separation — the need to avoid rate discrimination through hidden subsidies of some ratepayers by others." *RCA Alaska,* 597 P.2d at 504.

The second line of cases, establishing the rule that one class of consumer may not be required to subsidize another, begins with *Smyth v. Ames,* 169 U.S. 466, 540-541, 42 L.Ed. 819, 18 S.Ct. 418 (1898), where the court stated:

"If it be found upon investigation that the profits derived by a railroad company from its interstate business alone are sufficient to cover operating expenses on its entire line, and also to meet interest, and justify a liberal dividend upon its stock, may the legislature prescribe rates for domestic business that would bring no reward and be less than the services rendered are reasonably worth? Or, must the rates for such transportation as begins and ends in the State be established with reference solely to the amount of business done by the carrier wholly within such State, to the cost of doing such local business, and to the fair value of the property used in conducting it, without taking into consideration the amount and cost of its interstate business, and the value of the property employed in it? If we do not misapprehend counsel, their argument leads to the conclusion that the State of Nebraska could legally require local freight business to be conducted even at an actual loss, if the company earned on its interstate business enough to give it just compensation in respect of its entire line and all its business, interstate and domestic. We cannot concur in this view. In our judgment, it must be held that the reasonableness or unreasonableness of rates prescribed by a State for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier, or to the profits derived from it."

In *The Minnesota Rate Cases,* 230 U.S. 352, 435, 57 L.Ed. 1511, 33 S.Ct. 729 (1913), the court restated the rule:

"Where the business of the carrier is both interstate and intrastate, the question whether a scheme of maximum rates fixed by the State for intrastate transportation affords a fair return, must be determined by considering separately the value of the property employed in the intrastate business and the compensation allowed in that business under the rates prescribed. This was also ruled in the *Smyth Case* . . . . The reason, as there stated, is that the State cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, and, on the other hand, the carrier cannot justify unreasonably high rates on domestic business because only in that way is it able to meet losses on its interstate business."

The *RCA Alaska* court summarized this line of cases:

"Several subsequent cases have followed the approach of *Smyth v. Ames* and the *Minnesota Rate Cases.* However, other decisions have concluded that separation of intrastate and interstate business is not compelled by the reasoning of these cases or by the jurisdictional limits expressed in *Smith v. Illinois Bell Telephone Co.* See in particular *Capital Transit Co. v. Public Utilities Commission,* 93 U.S. App. D.C. 194, 213 F.2d 176 (1954), and *State ex rel. Allied Daily Newspapers of Washington v. Washington Public Service Commission,* 44 Wash. 2d 1, 265 P.2d 270 (1953)." 597 P.2d at 505-06.

In *RCA Alaska* itself, the Alaska commission had denied interim rate relief on the ground that total company operations established nonconfiscation regardless of the adequacy of intrastate rates. The Alaska Supreme Court affirmed a trial court's reversal of the commission, first on the ground that commission regulations required separation of interstate and intrastate operations, and prescribed the NARUC Separations Manual as the method. The court applied the familiar rule that administrative bodies are required to follow their own regulations. Secondly, the court stated:

"[A]lthough the Supreme Court of the United States had indicated . . . that integrated company operations properly may be used in rate-making under limited conditions, we think the APUC's position contravenes the Supreme Court's prohibition on hidden subsidies as expressed in *Smith v. Ames* and the *Minnesota Rate Cases.* In the case at bar, the APUC has apparently proceeded on the assumption that in determining whether confiscation has occurred, supplementation of intrastate revenues by interstate revenues is permissible." 597 P.2d at 506.

As noted, there are cases which have not required separation of intrastate and interstate operations. In *Capital Transit Co. v. Public Utilities Com'n,* 213 F.2d 176 (D.C. Cir. 1953), *cert. denied* 348 U.S. 816 (1954), the court upheld a system-wide method of determining rates for an electric company operating in

the District of Columbia, Maryland, and Virginia, and interstate. The rates had been determined on the basis of a system-wide rate base, revenues, and expenses. Rate schedules for the District of Columbia were then approved in amounts, which if applied system-wide, would net the required revenues. The court approved this, noting the United States Supreme Court cases discussed in *RCA Alaska,* and concluded there was no requirement of "any particular segregation formula." The court went on to state:

"This leaves undetermined, however, the validity of rates actually approved for District consumers. Here the problem which gave rise to the allocation requirement remains even though that formula may not be the only route to its solution. We must be able to say that the rates in the District are reasonable, just and nondiscriminatory as a part of, or in relation to, the system rates contained in the schedules of the Power Company for areas and services beyond the Commission's jurisdiction; that is to say, that District consumers do not subsidize the non-District, or, indeed, vice versa." 213 F.2d at 182.

The case was remanded for findings "which give a valid basis for the rates fixed for the District in this context of system-wide rates . . . ." Thus, although *Capital Transit* is authority for the position that separation of operations may not always be required, it also holds that where separation is not done, nondiscriminatory rates must nonetheless be demonstrated.

In *State ex rel. Allied etc. v. W.P.S.C.,* 44 Wash. 2d 1, 265 P.2d 270 (1953), the question concerned the rates charged by a bus company for the transportation of newspapers. The evidence established that carrying the newspapers was incidental to the bus company's main business and was done only when adequate space was available. The rate was based on the weight of the papers regardless of distance carried and all records were kept by the newspapers. It was held that a computation of the costs to the bus company of carrying the newspapers was "very impractical." It was also established that most of the bus company's business as it related to newspaper carriage was limited to Washington state, although there was some delivery to British Columbia, Oregon, Idaho and Montana. Noting the United States Supreme Court cases discussed above dealing with integrated companies and difficulty of separation, the court held that the utilities commission did not err in considering the entire operation of the bus company.

In the present case, there is no impracticability present in

separating interstate from intrastate operations. The NARUC-FCC Separations Manual exists and was apparently the basis of the study performed by the independent auditor for Elkhart for toll revenue division, which was in turn used by Staff. In addition, without application of some separation formula, there is no real question but that discrimination between interstate and intrastate rates would result.

Elkhart cites no authority for its position that separation is inappropriate and unreasonable in this case. It contends only that the United States Supreme Court cases cited by the KCC as requiring separation, and discussed above, are distinguishable in that those are cases:

"in which a specific rate of return determination was made by an interstate regulatory body on the one hand, and by an intrastate regulatory body on the other hand, and the Court has held in those cases it is necessary to separate that portion of the utility's operations attributable to both the intrastate and the interstate portions in order to test the reasonableness or adequacy of the rate of return as to both the interstate and the intrastate jurisdictions. *We submit that situation does not apply in the instant case in that the record clearly shows that the toll rates, both intrastate and interstate, paid by the customers of the Elkhart Telephone Company, Inc. are determined without regard to the investment, revenues and expenses of the Elkhart Telephone Company, Inc.* The interstate portion of the toll rates is determined in Federal Communications proceedings designed to determine reasonable rates and a fair rate of return to American Telephone and Telegraph Company; whereas, the intrastate toll rates are determined by the Kansas Corporation Commission in Southwestern Bell Telephone Company rate case proceedings. *In neither instance is there any concern for the investment in facilities, or the revenues and expenses related to Elkhart Telephone Company's participation in toll services."* Emphasis added.

This argument was rejected in *General Telephone Company of Florida v. Carter*, 115 So.2d 554 (Fla. 1959). That case involved an independent telephone company. The commission had at first considered the overall operations (interstate and intrastate) of the company. Its rationale was essentially that advanced by Elkhart:

" 'In our consideration of this case we have come to the conclusion that we must consider the overall operations of the company. If we consider only the exchange operations to the exclusion of the state and interstate toll then the utility's return will be below the level we have found to be required. If we consider the exchange and the state toll together then the company's overall return would be in excess of that found to be reasonable. In all fairness to the subscribers and the company we feel that we must base the increase on the system results. In arriving at this opinion we have taken into consideration the fact, too, that there is no method provided whereby the interstate earnings of a telephone company, such as the

applicant, can be increased or decreased through regulatory action. Interstate telephone rates are controlled by the Federal Communications Commission through whatever regulation it imposes on the Bell System which in turn dominates interstate telephone service. An independent telephone company can be losing money on its interstate service but there is little if anything it can do about securing authority to increase interstate rates for such service. About its only recourse would be to secure, if possible, an improved toll settlement agreement with the Bell System. By the same token an independent can be earning an excessive return on its interstate business but reducing interstate rates is another matter. Where such a situation exists, which is tantamount to an absence of Federal regulation of the interstate portion of the utility's business, we feel that it is proper to consider the system operations of the utility in determining proper rates for local service.' " 115 So.2d at 557-58.

On reconsideration, the commission reversed itself and limited its consideration to intrastate operations and the Florida Supreme Court affirmed, citing *The Minnesota Rate Cases* and *Smith v. Illinois Bell Tel. Co.,* and stating:

"Separation is not a theoretical problem of methods but is a necessary recognition of the fact that the Commission's sphere of authority is basically intrastate in nature. Had the matter rested here this Court would have been forced to quash the Commission's orders.

"Fortunately for those who support the validity of the instant proceedings the Commission rectified its error and on reconsideration made the requisite separation . . . ." 115 So.2d at 559.

A similar argument was also rejected in *RCA Alaska:*

"Petitioners suggest that the settlement contract is not an interstate rate established by the Federal Communications Commission but rather an agreement negotiated independently between RCAA and AT&T. In our opinion, this argument is irrelevant to the question whether an intrastate separation is required — as it was in *Smith v. Illinois Bell Tel. Co.,* 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930). However, the nature of the settlement may be relevant to a determination of what separations methodologies are appropriate." 597 P.2d at 500, n. 30.

The fact that Elkhart's toll revenues are derived under the settlement agreement with Bell, which in turn is not based on "investment, revenues and expenses," is irrelevant to whether separation is required. Otherwise, this fact alone could justify both the KCC exceeding its jurisdictional authority and discriminatory rates. There is no escaping the fact that in this case failure to separate interstate and intrastate operations would result in the local exchange rates subsidizing the interstate rates. The foregoing cases establish that this may not be done. See also *Jones v.*

*Kansas Gas and Electric Co.,* 222 Kan. 390, Syl. ¶ 10, 565 P.2d 597 (1977). We find no error.

Elkhart next contends the separation in this case, based on a study which in turn was based on the NARUC-FCC Separations Manual, is not supported by the evidence. The record reveals the Commission was made aware of the statement in the manual that it was "not designed to be utilized in determining the cost of individual services within each jurisdiction for ratemaking purposes." It is argued this renders the manual an insufficient basis for separation of rate base, revenue and expenses. The Commission correctly argues that this language means only "the amounts allocated to the accounts between the interstate and intrastate jurisdictions are not necessarily proper or allowable amounts for regulatory purposes. Each commission must make such decisions . . . in its jurisdictional rate case." Evidence as to a separation under the manual was presented by Yates. This was substantial evidence. Other courts have held the manual to be a proper method of separating interstate and intrastate operations for rate purposes. *State v. Public Service Comm.,* 131 Mont. 272, 309 P.2d 1035 (1957); *Bell Tel. Co. v. Pub. Ser. Comm.,* 70 Nev. 25, 253 P.2d 602 (1953); *Norfolk v. Chesapeake, etc., Tel. Co.,* 192 Va. 292, 64 S.E.2d 772 (1951). It has also been held that although use of the manual is not error, a commission is not required to use it if some other method can be justified. See *Petition of Mountain States Telephone and Tel. Co.,* 76 Idaho 474, 284 P.2d 681 (1955); *Pacific Tel. & Tel. Co. v. Hill,* 229 Or. 437, 365 P.2d 1021 (1961). We find no error in the use of the manual in this case.

Elkhart next contends the authorized 12.46 percent overall rate of return and 15.5 percent return on equity were based on "an accountant's computation" and cannot be evidence of reasonable rates. Such accounting evidence is, of course, used in all rate cases. It is derived from the data submitted by the utility or discovered by Staff during an investigation, and is clearly proper. Elkhart's real contention is again a challenge to the separation and the fact that its witness testified that a 19.8 percent return on equity was needed. The Commission, however, adopted the evidence of Staff's witness. The return rates are thus based on substantial evidence. No error is shown.

Finally, Elkart complains of a statement in the Commission's findings that Elkhart's position is not static and that increased

revenue from a rate increase granted to SWB will impact upon it. It is difficult to discern why this comment is of concern to Elkhart. The statement clearly is not related to the specific findings as to rate of return or separation and appears to be a gratuitous statement directed only at Elkhart's argument that it can receive no relief from the toll portion of its revenues. Again, no error is shown.

Affirmed.